**Damon RUNYON, Jr., Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 18068.**

United States Court of Appeals
Fifth Circuit.

Aug. 11, 1960.

Effie Knowles, Roy L. Struble, Miami, Fla., for appellant.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, David O. Walter, Attys., Dept. of Justice, Washington, D. C., E. Coleman Madsen, U. S. Atty., Miami, Fla., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment by the trial court, sitting without a jury, denying capital gains treatment to sums received by appellant under a contract by which he gave moving picture rights

treating of the life of his father, the eminent sports writer, Damon Runyon.

The taxpayer is the son, and one of two surviving children of the wellknown author, Damon Runyon. The record does not disclose the basis on which appellant asserted the right to act on behalf of his deceased father in the disposition or granting of any rights in the use of the story of his father's life for moving picture purposes other than what is contained in one of the preliminary clauses of the contract which states, "Mary Runyon McCann and said Damon Runyon, Jr. are the only two known living children of Alfred Damon Runyon, Sr." The contract then provides:

"Whereas, Grant desires to produce, release, distribute and exhibit, or to cause to be released, distributed and exhibited, a motion picture photoplay based upon the life of said Damon Runyon, Sr., and for the purpose thereof is desirous of acquiring from said Damon Runyon, Jr., the right and license to depict, portray or impersonate, in said photoplay, Damon Runyon, Jr., upon the terms and conditions hereinafter set forth."

The operative provisions of the contract were to the following effect:

(1) The taxpayer did thereby "license" Grant to produce "one motion picture photoplay," based upon the life of Alfred Damon Runyon, Sr.

(2) The taxpayer consented to the portrayal, in that motion picture, of his father, and of himself.

(3) He agreed that "For so long as this agreement is in force and effect" he would not grant permission to, or authorize, any other person, firm or corporation to produce or exhibit any motion picture photoplay based on his father's life, or consent to the portrayal, depiction or impersonation of his father or of himself in any other motion picture.

(4) Grant was "further licensed" to advertise, promote and exploit the photoplay by all means customarily used in the trade.

(5) Grant covenanted that no use of the name or depiction of either taxpayer or his father would be made that would subject them to hatred, obloquy, ridicule, etc., and taxpayer was given the right to approve parts of the picture.

(6) The license was to terminate and consents withdrawn, if at the end of there years the photoplay was not completed and generally released in the United States, except that, if within that time Grant had commenced principal photography, it would have an additional year to complete and release the photoplay.

(7) In any event, the license was for a maximum period of eight years, with an option in Grant to "remake" the picture for a further term of eight years.

(8) The taxpayer was paid $25,000 in consideration of this agreement and in consideration of his agreement to be employed as a technical adviser for a minimum of fifteen weeks at a weekly salary of $500.00. He was also to receive a percentage of the net profits from the picture.

Grant did nothing under the contract; the motion picture was never made; and the contract terminated at the end of the three-year term.

Taxpayer claimed the right to treat the $25,000 received by him as gain from the sale of a capital asset under Section 117 (a) (1) of the Internal Revenue Code, 26 U.S.C.A. § 117(a) (1), which describes capital assets as follows:

"The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * *."

The parties agreed that the contract, having been executed in the State of New York was to be governed by the laws of that state. Appellant contended and here urges that under the laws of the State of New York taxpayer sold property held by him. The Government contends on the contrary that whatever rights taxpayer dealt with in the contract did not constitute property, and

if they did they were not "property held" by the taxpayer within the contemplation of Section 117(a) (1), and moreover that there was no sale, but rather the grant of a privilege or license. Both parties agree that the use of the word "license" does not of itself determine the nature of the contract.

We think it is clear that the trial court correctly determined that there was here no sale or assignment of a capital asset. While the matter is not discussed in the briefs, a reading of the record makes us question seriously whether the taxpayer had any legal right in his father's name or life story. Taxpayer's brief blandly assumes that since he was one of two children of Damon Runyon, Sr., it thus became apparent for the purposes of this litigation that he had either inherited or acquired by descent and distribution some right to protect his father's name and thus some right to consent to the use of it. No authority of any kind is cited for this proposition.

■ It is not necessary, however, to place our decision on this failure of proof of interest in the taxpayer in whatever rights or privileges might have attached to any person connected with Damon Runyon, Sr. The New York cases, prior to the enactment of Sections 50 and 51 of the New York Civil Rights Law, 8 McKinney's Consolidated Laws of New York, 1948 ed., c. 6, had clearly held that there was no right of privacy in New York. Robinson v. Rochester Folding-Box Co., 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, and Kimmerle v. New York Evening Journal, Inc., 262 N.Y. 99, 186 N.E. 217. The above mentioned sections of the New York Civil Rights Law do create a right of privacy. Section 50 provides as follows:

"A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor."

A reading of this section clearly shows that it applies only to a living person. No New York case has been cited to indicate that such right of privacy exists on behalf of the son of a deceased person or on behalf of the personal representative of a deceased person.

Appellant does not contend that the compensation was paid to him in order to obtain his consent for the use of his name under this statute. His claim is that the $25,000 was paid to him for the right to use his father's name and life story.

■ We think the Government's position is also sound in asserting that even though the taxpayer had a property right in the name and story of his father's life, there was nevertheless no sale of it. This is true because there was clearly only a limited right transferred. We are familiar with the cases decided by this Court such as Allen v. Werner, 5 Cir., 190 F.2d 840, and Bannister v. United States, 5 Cir., 262 F.2d 175, which hold that a provision for termination in the event of the breach of a licensing agreement does not of itself prevent a transfer of a patent from being an absolute sale, where the taxpayer has transferred every substantial right to the patent. Here the contract provided in its own terms for a limited period of enjoyment of the rights which it granted. There was, therefore, no conveyance of every substantial right owned by the taxpayer, if, in fact, he owned anything.

The judgment of the trial court is affirmed.