HELEN D. MILLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71569. Filed January 26, 1961.

*Jacob Rabkin, Esq.*, and *Robert M. Cipes, Esq.*, for the petitioner.
*James J. Quinn, Esq.*, for the respondent.

OPINION.

RAUM, *Judge:* Petitioner received $409,336.34 from Universal Pictures Company, Inc., in 1954. That amount was based upon certain percentages of gross proceeds from a motion picture entitled "The Glenn Miller Story" which Universal had produced pursuant to an agreement entered into between Universal and petitioner in 1952. Petitioner is the widow of a popular band leader named Glenn Miller who died in 1944, and the motion picture deals with his life story. Under the 1952 agreement it appears that petitioner became entitled to certain amounts prior to 1954 and would continue to receive further amounts after 1954 measured by the gross proceeds of the motion picture. However, only the amount received in 1954 is here in controversy, and the issue before us relates to its proper tax treatment. The Government's position throughout has been that this amount represents ordinary income, taxable in full in petitioner's hands. Petitioner's position, on the other hand, has undergone radical changes during this litigation. We think that those changes involve not only a modification of legal theory but represent a new view of the facts that is sharply at variance with her initial position. Petitioner, of course, was entitled to revise her contentions in her amended petition, but to the extent that they represent a new and inconsistent presentation of basic facts, it is appropriate to examine her present allegations with particular caution.

In the original petition it was alleged as fact that the proceeds to be received by petitioner from Universal under the contract were allocable to the extent of two-thirds thereof to the release of her right of privacy and to the extent of one-third thereof for her services; that she paid David Mackay, her attorney, $136,445.45 of the amount received from Universal (being one-third thereof)[1] and that she "re-

---

[1] Although the Commissioner originally disallowed a deduction for the amount of this payment, it is now stipulated that this payment is deductible.

ported the balance to the extent of $90,963.63 as taxable income to petitioner, that being the amount allocable for services, and $181,927.26 as a non-taxable receipt being damages received by petitioner for release of her right of privacy, that being the amount allocable thereto." Thus petitioner's initial position was that Universal's payment to her in fact consisted of two distinct and separable components, one of which represented compensation for her services which she admitted was taxable and the other being damages for release of *her* right of privacy which she contended was nontaxable. Had the case remained in this posture, there is no doubt that the total amount received from Universal (after allowance of deduction for attorney's fees) would be taxable as ordinary income. Petitioner admitted so much as to that portion allocable to her services under the contract, and the remaining portion allocable to compensation for waiver of possible invasion of her right of privacy would plainly be taxable as ordinary income in accordance with the following cases: *Damon Runyon, Jr.* v. *United States*, 281 F. 2d 590 (C.A. 5); *Meyer* v. *United States*, 173 F. Supp. 920 (E.D. Tenn.); *Ehrlich* v. *Higgins*, 52 F. Supp. 805 (S.D. N.Y.).

An appreciation of the unhappy consequences of petitioner's original position undoubtedly led to the filing of the amended petition in which an entirely different version of the transaction is set forth. Petitioner now urges that no part of Universal's payment to her was allocable either to services or to compensation in relation to her right of privacy. Instead, she now contends that she sold a capital asset to Universal, having a basis of zero, and that the entire payment is therefore taxable to her, but only as long-term capital gain. And she identifies the alleged capital asset as "the exclusive worldwide right in perpetuity to produce, distribute and exhibit" photoplays based upon the life and career of Glenn Miller. We do not agree that the new look can successfully change the old result.

The starting point for determining the nature of the payments is the contract itself. It begins with a recitation of Universal's plans to make a photoplay based on the life of Glenn Miller which would include portrayals of petitioner, her children, and other members of her family. Thus, from the beginning, the agreement is framed in terms of more than just the name and memory of Glenn Miller; it immediately directs attention to the fact that petitioner and her family, living persons, will be portrayed. To be sure, the first numbered paragraph speaks of granting "the exclusive right to produce * * * one or more photoplays based upon the life and activities of Glenn Miller." But the agreement deals with much more than such purported "grant." In paragraph 2 she agrees to allow Universal to portray *first* herself, then her deceased husband, her children, and

other members of her family, with the understanding that the photoplay might be "fictional to a great extent." Paragraph 3 includes an undertaking by petitioner to cooperate in making available information and materials relating to Glenn Miller. Although the evidence indicates that Universal made but little use of her services in this connection, this does not mean that such potential services were valueless at the time the contract was executed.

Paragraph 4 is a general warranty. Paragraph 5 is a specific release by petitioner of any claims based upon possible violations of the right of privacy. We think it meaningful that an entire paragraph is devoted directly to this matter and that it cannot be casually dismissed as "boiler-plate," as petitioner presently seeks to do. We do not believe that Universal took lightly its potential liability for possible violations of rights of privacy. In our judgment payments made by Universal under the contract reflected to a substantial degree consideration in relation to the right of privacy.[2]

In paragraph 6 petitioner agrees to use her best efforts to assist in obtaining "consents, permissions and/or clearances" which Universal deemed necessary from any person, except Glenn Miller's mother. Acting under this paragraph petitioner obtained releases from her husband's two brothers and a sister. And although she was not required to obtain the release of Glenn Miller's mother, the contract was terminable by Universal in the event that such release was not obtained, and petitioner did in fact obtain it for Universal. We are of the opinion that Universal regarded the services rendered pursuant to paragraph 6 to be of considerable value and that a substantial portion of the consideration payable to petitioner under the contract reflected compensation for such services.

We conclude therefore that substantial and important components of the consideration paid by Universal to petitioner were for release of claims for potential invasion of the right of privacy and for services of petitioner. There nevertheless remains the question whether the consideration paid by Universal did include in addition, an element for the "right" to make a photoplay or photoplays based upon Glenn Miller's life, and whether the transaction to that extent constituted the sale of a capital asset to Universal.

An analysis of the contract persuades us that in dealing with petitioner Universal was seeking to be relieved of liability of any kind

---

[2] Petitioner's argument that there could be no violation of a right of privacy in view of her veto power under paragraph 7 is fallacious. In the first place she had a veto power only over a "treatment" or first draft of a screenplay, and changes in details in the final version, although minor from the point of view of the photoplay as a whole, could seriously affect possible claims based upon violations of the right of privacy. And secondly, the failure to exercise the veto power together with paragraph 5 would simply represent petitioner's consent to any potential violation for which she was being compensated.

in relation to Glenn Miller's family by reason of making a motion picture based upon his life, whether such liability be for invasion of rights of privacy of one or more persons in the family, or violation of any other personal rights of such members of the family, or for "unfair competition" in using names, likenesses, etc., of such persons, including the decedent, or for the illegal appropriation of any possible property rights inhering in the names, likenesses, or reputations of any such persons, including those of the decedent. In short, Universal was paying the stipulated consideration primarily for having a free hand in producing a motion picture based upon the life of Glenn Miller (the facts of which were in the public domain) without any threat of interference by any member of his family and without incurring any liability therefor. And to the extent that petitioner might claim that she "owned" the right to produce such a motion picture, Universal wanted to make sure that such claim would be included among all other possible claims that would be released. We therefore agree with petitioner to the limited extent that the contract did formally contain a "grant" of a purported right to produce the motion picture, but we think that such "grant" was in substance no more than a release of any claim that petitioner might assert in relation to an alleged exclusive right to produce a photoplay dealing with Glenn Miller's life. Moreover, we do not agree that such "grant" was responsible for all of the consideration contracted for, and we do not agree that petitioner in fact had any recognized property to convey that would form the basis for the sale of a capital asset. The mere fact that she may have released a claim to an alleged property right does not mean that she sold such property, particularly where, as will be indicated shortly, it does not appear that she *owned* any such property.

Plainly, Glenn Miller having been a celebrity, and the facts relating to his life being in the public domain, neither he, if alive, nor anyone purporting to represent him thereafter could prevent the publication of a biography about him. *Koussevitzky* v. *Allen, Towne & Heath, Inc.*, 188 Misc. 479, 68 N.Y.S. 2d 779 (Sup. Ct.), affirmed 272 App. Div. 759, 69 N.Y.S. 2d 432; *Sidis* v. *F-R Publishing Corporation*, 113 F. 2d 806 (C.A. 2), affirming 34 F. Supp. 19 (S.D. N.Y.), certiorari denied 311 U.S. 711; cf. *Corliss* v. *E. W. Walker Co.*, 64 F. 280 (D. Mass.); *Jeffries* v. *New York Evening Journal Publishing Co.*, 67 Misc. 570, 124 N.Y.S. 780 (Sup. Ct.). How a biographical motion picture differs legally from a written biography in this respect is something that has not been made clear to us.[3] Perhaps it may be significantly different, but petitioner has not suggested even a pos-

---

[3] Cf. *Donahue* v. *Warner Bros. Picture Distributing Corp.*, 2 Utah 2d 256, 272 P. 2d 177, where a partially biographical motion picture was held not to violate the Utah privacy statute.

sible difference. And if Glenn Miller had any such *property* right (as distinguished from other rights in relation to tortious use of his name, likeness, reputation, etc.), it has not been shown to us that it was a right that survived him or that it was petitioner who succeeded to it at his death. If he owned such "property" and she succeeded to it, under what law did it arise, and under what law and how did she acquire it at his death in 1944? [4]

Petitioner's attempt to classify the right as a "right of publicity" hardly answers the question. To be sure, there is some reference to a "right of publicity" among a few decided cases, *Haelan Laboratories, Inc.* v. *Topps Chewing Gum, Inc.*, 202 F. 2d 866 (C.A. 2), certiorari denied 346 U.S. 816; *Hogan* v. *A. S. Barnes & Co., Inc.*, 114 U.S.P.Q. 314 (Pa. C.P.); cf. *Manger* v. *Kree Institute of Electrolysis, Inc.*, 233 F. 2d 5, 10, fn. 5 (C.A. 2); *Chaplin* v. *National Broadcasting Co.*, 15 F.R.D. 134, 139–140 (S.D. N.Y.); *Russell* v. *Marboro Books*, 18 Misc. 2d 166, 182, 183 N.Y.S. 2d 8, 27; Nimmer, "The Right of Publicity," 19 L. & Contemp. Prob. 203 (1954), but it seems plain from a reading of the decisions in this area that no such property right was generally recognized at the time of Glenn Miller's death in 1944, and it certainly has not been established that any such "property right" if it did exist under the law of any particular jurisdiction pertinent to this case would survive after the death of the celebrity. The Nimmer article, *supra*, upon which petitioner relies heavily, and which was published about 10 years after Glenn Miller's death, stated that (p. 218): "It would be premature to state that the right of publicity has as yet received any substantial degree of judicial recognition." Moreover, it has been said as recently as 1958, that no such property right exists in California, *Strickler* v. *National Broadcasting Co.*, 167 F. Supp. 68,

[4] Petitioner's brief, which was otherwise strong and careful, failed to indicate by a citation of any supporting case law how and where petitioner inherited the particular "property right" which she contends that she sold to Universal. There is some evidence in the record suggesting that her husband, Glenn Miller, may have been domiciled in New Jersey at the time of his death in 1944 and it was stipulated his will was probated in New Jersey. Presumably, if such a "property right" passed to petitioner, it would have done so under New Jersey law. Yet, petitioner has cited no New Jersey authority, nor for that matter authority in any other jurisdiction, to support the proposition that if such right otherwise existed, it would have survived his death and that she would have succeeded to it. And we are satisfied that under New York or California law, which might perhaps be regarded as applicable on this record, no such right would in any event be recognized after death. In addition, it is a matter of some interest, though by no means conclusive, that the estate tax return for the estate of Glenn Miller included no valuation of an "asset" connected with the motion-picture rights to the deceased's life story.

Cf. *Damon Runyon, Jr.* v. *United States*, 281 F. 2d 590 (C.A. 5), where the Court of Appeals said (p. 592):

"We think it is clear that the trial court correctly determined that there was here no sale or assignment of a capital asset. While the matter is not discussed in the briefs, a reading of the record makes us question seriously whether the taxpayer had any legal right in his father's name or life story. Taxpayer's brief blandly assumes that since he was one of two children of Damon Runyon, Sr., it thus became apparent for the purposes of this litigation that he had either inherited or acquired by descent and distribution some right to protect his father's name and thus some right to consent to the use of it. No authority of any kind is cited for this proposition."

70 (S.D. Cal.), and we have not been directed to the law of any State pertinent to this case that would justify us in concluding that petitioner succeeded to a property right in 1944 to produce a motion picture based upon Glenn Miller's life. The situation before us is unlike *Rose Marie Reid*, 26 T.C. 622, where a trade name, identified with a particular product, was registered in the United States Patent Office and held to be a property right that could give rise to capital gain.

The question in this case is not whether a person's name, image, reputation, attainments, life story, or other manifestations of personality may be entitled to legal protection as against a possible tort-feasor who seeks to obtain commercial advantage by using one or more of the indicia of the celebrity's personality—a question on which there is a wide variety of authority in different jurisdictions under varying conditions.[5]  E.g., *O'Brien* v. *Pabst Sales Co.*, 124 F. 2d 167 (C.A. 5), certiorari denied 315 U.S. 823; *Uproar* v. *National Broadcasting Co.*, 8 F. Supp. 358 (D. Mass.), modified 81 F. 2d 373 (C.A. 1), certiorari denied 298 U.S. 670; *Waring* v. *WDAS Broadcasting Station, Inc.*, 327 Pa. 433, 194 Atl. 631; *Waring* v. *Dunlea*, 26 F. Supp. 338 (E.D. N.C.); *RCA Mfg. Co.* v. *Whiteman*, 114 F. 2d 86 (C.A. 2), certiorari denied 311 U.S. 712; *Miller* v. *Madison Square Garden Corp.*, 176 Misc. 714, 28 N.Y.S. 2d 811 (Sup. Ct.); *Gautier* v. *Pro-Football Inc.*, 304 N.Y. 354, 107 N.E. 2d 485; *Ettore* v. *Philco Television Broadcasting Corp.*, 229 F. 2d 481 (C.A. 3), reversing 126 F. Supp. 143 (E.D. Pa.), certiorari denied 351 U.S. 926.  The pivotal issues here are whether such right, if it exists, is a property interest, whether it extends to the making of a biographical motion picture with possible fictional episodes, and whether such right, if it otherwise exists under some applicable law in relation to a living person, passes to a surviving spouse.[6]  The answers to *all* these questions must be in the affirmative as applied to petitioner before we can hold that even a part of the consideration received by her from Universal represents capital gain.  We are unable to reach any such result.  That such consideration may have been intended in part to remove forever any possible claims that petitioner might have asserted against Universal growing out of its production and distribution of a motion picture based upon Glenn Miller's life cannot convert the transaction into the sale of a capital asset.  We hold that petitioner has not shown

[5] "The state of the law is still that of a haystack in a hurricane." So wrote Judge Biggs in 1956 in *Ettore* v. *Philco Television Broadcasting Corp.*, 229 F. 2d 481, 485 (C.A. 3), to describe the confusion in the cases which have protected the right of privacy and related personal or property rights.

[6] Petitioner presented a considerable amount of evidence describing efforts on her behalf to prevent the "unauthorized" use of the Glenn Miller name. However, it has not been shown that the acquiescence of others in this connection was motivated by any clear recognition of such alleged property right rather than by a determination to avoid possible litigation that could be initiated on a variety of grounds. Nor has it been revealed to us upon what ground relief was granted in the only case shown to have been litigated.

any error in the Commissioner's treatment of the consideration received by her from Universal as ordinary income.

*Decision will be entered under Rule 50.*