**Helen D. MILLER, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 76, Docket 27018.**

United States Court of Appeals
Second Circuit.

Argued Jan. 4, 1962.

Decided Feb. 6, 1962.

---

Robert M. Cipes, New York City (Jacob Rabkin, and Mark H. Johnson, New York City, on the brief), for petitioner.

David C. Acheson, Attorney, Department of Justice, Washington, D. C. (John B. Jones, Jr., Acting Assistant Attorney General, David O. Walter, Meyer Rothwacks, Attorneys, Department of Justice, Washington, D. C.), for respondent.

Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge.

Petitioner is the widow of Glenn Miller, a band leader who achieved world fame about twenty-five years ago. Although Glenn Miller died in 1944, petitioner has been able to engage in a number of enterprises actively exploiting his continuing popularity. Apparently "the good that men do," if sufficiently publicized, does live after them, for petitioner's commercial efforts have met with appreciable financial success.

Thus, in 1952, she entered into a contract with Universal Pictures Company, Inc. (Universal) in connection with the production of a motion picture film entitled "The Glenn Miller Story"; and in the calendar year 1954, she received $409,336.34 as her share of the income derived from that theatrical venture. According to the terms of the 1952 contract, petitioner had purportedly granted to Universal "the exclusive right to produce, release, distribute and exhibit * * one or more photoplays based upon the life and activities of Glenn Miller throughout the world"; and had warranted that she was "the sole and exclusive owner of all the rights" conveyed by her.

Petitioner now contends that the payment received in 1954 from Universal pursuant to that contract should be considered, for income tax purposes, as a "gain from the sale or exchange of a capital asset held for more than 6 months * * *" 26 U.S.C. § 1222; while the Commissioner, whose position was sustained by the Tax Court, contends that the 1954 payment must be treated as ordinary income.[1] That is the difference between the parties, and in terms of taxes allegedly due in this case, it amounts to

---

1. The Tax Court concluded that, (a) petitioner was compensated by Universal for services which she had agreed to render in connection with the photoplay; (b)

$159,850.71. Since there is little doubt on the facts presented here that there was a "gain," a "sale or exchange," and a holding "for more than 6 months," the specific question dividing the parties relates to the meaning of the term "capital asset." Furthermore, since Section 1221 of the Internal Revenue Code of 1954, 26 U.S.C. § 1221, defines the term "capital asset" as *property* held by the taxpayer * * * " (emphasis supplied), and since, if anything was held by anyone it was held by the petitioner,[2] the conflict is narrowed to the meaning of the word "property" for purposes of this section of the Code.

One would assume that since the question is so easily narrowed, the answer would be correspondingly free of difficulty. The assumption is unwarranted. The narrowing of a question does, ordinarily, reduce the *complexity* of the answer; but it also tends to increase the difficulty of reaching it. Moreover, in order to avoid creating more problems than we resolve, we wish to emphasize that throughout the ensuing discussion, our analysis of the term "property" is made within the context of capital gains taxation; universality in definition is not only unlikely, but undesirable.

The Internal Revenue Code does not define "property" as used in Section 1221. "It is here that the Code itself discloses the enormity of the problem." Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 988 (1956). This is one of those instances in which the drafters of that statute have (for obvious reasons) declined the challenge of preserving a chameleon in a pithy phrase. See 3B Mertens, Federal Income Taxation, § 22.12 (1958). Therefore, we must look outside the eight corners of the code for some elucidation. The ordinary technique is to refer to principles of state property law for, if not an answer, at least a hint. Since ultimately it is the Congressional purpose which controls, such non-tax definitions are certainly not binding on us. See Ernest A. Watson, 15 T.C. 800, 813 (1950), aff'd, on other grounds, 197 F.2d 56 (9th Cir. 1952), aff'd, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed. 1232 (1953); cf. Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199 (1932). On the other hand, Congress may be presumed to have had ordinary property concepts in mind so they are relevant to our inquiry.

Most people trained in the law would agree that for many purposes one may define "property" as a bundle of rights, protected from interference by legal sanctions. Cf. Restatement, Property, §§ 1–5. This concept is behind one prong of petitioner's attack. She cites several cases,[3] claiming they indicate that if Universal had made its motion picture without contracting with her, it would have been the victim of a substantial lawsuit.

petitioner accepted a share in the proceeds of the motion picture as an advance settlement of any liability which Universal might incur because of an invasion of privacy; and (c) petitioner had no "property right" in the name, image, reputation etc. of Glenn Miller which could qualify as a capital asset. Although the Tax Court's discussion of issues (a) and (b) suggests that there are alternative theories upon which this Court might affirm its decision, we prefer to dispose of the matter by accepting, *arguendo*, petitioner's theory that the contract dealt with a conveyance of "property" only. For this purpose we ignore the fact that taxpayer's original petition characterized the contract proceeds as constituting both a payment for taxpayer's services and a settlement of tort liability.

2. It is clear that whatever was sold to Universal was either created by petitioner, or owned by her deceased husband during his life. In addition, there is no dispute that under his will petitioner was the decedent's sole beneficiary.

3. Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, 58 A.L.R.2d 626 (3rd Cir.), cert. denied 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956); Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2nd Cir.), cert. denied 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); Uproar Co. v. National Broadcasting Co., 8 F.Supp. 358 (D.Mass.1934), aff'd, 81 F.2d 373 (C.C.A. 1), cert. denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).

Even if this were so, those cases would not compel this court to recognize, for income tax purposes, a "property right" in Glenn Miller himself if he were still alive. However, it is not necessary for us to reach a determination upon such an assertion. Those cases do not even remotely bear on the question whether such a property right,[4] if it existed, could pass to the sole beneficiary under his will; and certainly they lend no support to petitioner's theory that the reputation or fame of a dead person could give rise to such "property rights." [5] In fact, in the only case cited in which the rights of a dead man were considered at all, the court held against the claimant. Runyon, Jr. v. U. S., 281 F.2d 590, 592 (5th Cir. 1960). Indeed, petitioner is well aware of this, for she concedes that at the time of the "sale" there were "no *clear-cut* decisions * * * protecting publicity rights of a deceased celebrity * * *" (Pet.Br. p. 43).

Undeterred by her failure to find case authority which would substantiate the existence of "property rights" petitioner invokes the authority of logic. With considerable ingenuity, she argues:

(1) Universal paid petitioner $409,-336.34 in 1954, which is a great deal of money.[6]

(2) Universal was a sophisticated corporate being to which donative intent would be difficult to ascribe.

(3) If there was no danger in free use of Glenn Miller material,[7] why did Universal pay?

Petitioner appears to find this question unanswerable unless it is conceded that there was a sale of a "property right." Petitioner is wrong.

It is clear to this Court, at least, that many things can be sold which are not "property" in any sense of the word. One can sell his time and experience, for instance, or, if one is dishonest, one can sell his vote; but we would suppose that no one would seriously contend that the subject matter of such sales is "property" as that word is ordinarily understood. Certainly no one would contend that such subject matter was inheritable. We

---

4. The Ettore and Haelan Laboratories cases, both decided after the petitioner contracted with Universal, involved "rights" of living persons. Ettore, which concerned the exclusive "right" to publication of one's own performance, is wholly inapposite, since petitioner does not purport to grant rights to a performance of Glenn Miller. Haelan Laboratories, which held that a living celebrity has a "right of publicity" in the use of his own photograph, under New York Law, carefully avoided terming it a "property right," no doubt in order to avoid unintended consequences which might follow from such classification. Uproar, apparently an application of pre-Erie "federal contract law," held that a living person's grant of the use of his name created "rights of a pecuniary nature * * * which partake of the *elements* of property rights." (Italics added.) 8 F.Supp. 361. Aside from its questionable authority as the law of any state, and the "unfair competition" context in which the issue arose, this case has little application because of the scope of the rights asserted to exist in the present instance.

5. There is apparently a right under continental law, which is similar to the "prop-

erty right" asserted by petitioner, the so-called "moral right." See e. g., Strauss, The Moral Right of the Author, 4 Am.J.Comp. 506 (1955). This seems to encompass the right to prevent the "distortion, mutilation or other alteration" of an author's work. See art. 6 *bis*, section (1) of the Brussels Convention (1948); Strauss, *op. cit. supra* at p. 509; and that right may pass to the heirs of the author in certain circumstances. See art. 6 *bis*, section (2) of the Brussels Convention (1948). Whether it would permit the heirs of Glenn Miller to protect "The Glenn Miller Story" is unclear. But, in any event, the moral right, as such, is not recognized in this country.

6. It should be noted that petitioner received a fixed percentage of the income produced by the motion picture. Only the ultimate success of the venture, the extent of which was unknown at the time of the signing of the contract, made the sum actually paid so high.

7. Petitioner characterizes the subject matter of the sale variously as Glenn Miller's "story" (Pet.Br. p. 27), as "good will" (Pet.Br. pp. 27, 37), and as a "right of publicity" (Pet.Br. p. 32).

conclude, therefore, that not everything people pay for is "property."

In the instant case, "something" was indeed sold. And the expedient business practice may often be to sell such "things." But the "thing" bought, or more appropriately "bought off," seems to have been the chance that a new theory of "property" might be advanced, and that a lawsuit predicated on it might be successful. It was a purchase, so to speak, of freedom from fear. In effect, it was a hedge against the chance that the Miller "property" *might* exist. Because Universal feared that it might sometime in the future be held to have infringed a property right does not mean, however, that a court presently considering whether that property right *did* exist in 1952 must realize Universal's worst fears. That does not mean that Universal's payment was foolish or illusory. It got what it contracted for in 1952 and what it later paid Mrs. Miller for: freedom from the danger that at a future date a defensible right constituting "property" *would* be found to exist. But it didn't pay for "property." [8]

It may be helpful to compare this situation with one which involves the settlement of a tort claim, e. g., a negligence lawsuit. No one doubts the existence of a legal principle creating liability for negligence. If the facts are as a plaintiff contends, and they come within that principle, the defendant's liability exists. Even if they do not, the defendant, for his own reasons, may agree to make a payment in settlement of his alleged liability. Moreover, the Commissioner, for purposes of taxation, may accept that settlement as an implied affirmation that the *facts* were substantially as the plaintiff contended, and treat the recovery accordingly. But no two individuals can, by agreement between themselves, create a *legal* principle, binding upon everyone else, including the Commissioner, where none existed before. This is the exclusive domain of the legislature and the courts as repository of the public will. Admittedly, this court cannot overlook the fact that much of the work of a lawyer is predicting future judicial advances (or aberrations, perhaps); and that is undoubtedly what Universal's lawyers were doing in 1952. But, a lawyer's prediction of the future, as some lawyers know, is not law.

In any event, we are unwilling to accept the fact of substantial payment as proof that "property" within the meaning of Section 1221 of the Code exists; and for the reasons stated, we must reject this argument as being in reality a makeweight.[9] Petitioner concedes that at the time of the "sale" there had been no authoritative decision holding that a decedent's successors had any "property right" to the public image of a deceased entertainer; and therefore it follows that their bargain was not, at that time, a bargain that both parties knew involved a "property right." Furthermore, we do not find it necessary to decide whether the parties were then bargaining for a property right. The case before us only involves the meaning of language in a highly technical statute and the legal effects flowing from that language.

"[I]t is evident that not everything which can be called property in

---

8. One must remember that, the techniques of advertising and promotion being what they are, timing is very important and a successful motion for a preliminary injunction made by one who *claims* a "property right" might be as disastrous as a final award of damages. One can easily find wisdom in this payment by Universal without finding that it paid for "property."

9. "Since in one sense everything that the taxpayer holds is 'property' * * * it would seem to follow that all income could well be 'capital gain'—for any moneys received by a taxpayer could readily be regarded as the result of the surrender by him of 'property' in the form of either tangible assets or intangible property such as claims to moneys. Hence, unless the definition is to be useless, exclusions must be found." Surrey, supra.

the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset * * *" C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617 (1960); C. I. R. v. Phillips, 275 F.2d 33, 35 (4th Cir. 1960). Gains which result from the sale or exchange of capital assets receive preferential tax treatment. Therefore, "the definition of a capital asset must be narrowly applied," Corn Products Refining Co. v. C. I. R., 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955); Mansfield Journal Co. v. C. I. R., 274 F.2d 284, 286 (6th Cir. 1960), in order to effectuate the basic Congressional purpose "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, supra, 287 U.S. at p. 106, 53 S.Ct. at p. 75; Corn Products Refining Co. v. C. I. R., supra. We do not believe that for income tax computation purposes the beneficiaries of the estate of a deceased entertainer receive by descent a capitalizable "property" in the name, reputation, right of publicity, right of privacy or "public image" of the deceased; or that in this case the petitioner, for tax purposes, owned any "property" which came into existence after Glenn Miller's death.[10] Therefore, income received by Mrs. Miller from contractual arrangements made by her with Universal dealing with deceased's intangible rights of the nature above specified is "ordinary" income as opposed to capital gain or loss under § 1221 of the Internal Revenue Code of 1954.

Affirmed.

10. Petitioner insists that in Thomas D. Armour, 22 T.C. 181 (1954) we have a "reasonably definite indication" (Pet.Br. p. 32) that the Tax Court would, under some circumstances, hold that a right of publicity is property which qualifies as a capital asset. In that case a living celebrity granted the use of his name to a golf ball manufacturer. The court did not discuss the issue of whether there was "property," but held that on the facts of that case there was no "sale." Petitioner regards this as an implied recognition of the "property right"; but we think, to the contrary, that the absence of a "sale" was used to avoid that very issue. Compare Runyon, Jr. v. U. S., supra.