**MEMPHIS DEVELOPMENT FOUNDATION, Plaintiff,**

v.

**FACTORS, ETC., INC., Defendant.**

**No. 77–2545.**

United States District Court,
W. D. Tennessee, W. D.

Dec. 5, 1977.

Ronald S. Borod, David J. Cocke, G. Breen Bland, Jr., Memphis, Tenn., for plaintiff.

Thomason, Crawford & Hendrix, John J. Thomason, Memphis, Tenn., for defendant; Ervin, Cohen & Jessup, Beverly Hills, Cal., of counsel.

## MEMORANDUM OPINION

WELLFORD, District Judge.

Plaintiff is a Tennessee "not for profit" corporation, and has sued defendant in this diversity action, a Delaware corporation, relative to the right to advertise and promote a statue of the late Elvis Presley. Elvis Presley, a resident of Memphis, died on August 16, 1977, and shortly thereafter plaintiff, in an effort to memoralize him, commissioned one Erick Parks to design and cast a bronze statue of Presley, which would be erected in his home city, Memphis. To finance the projected $200,000 cost of the project, plaintiff announced its intention to give eight-inch pewter replicas of the bronze statue to persons who contribute $25.00 or more to plaintiff. Plaintiff projects that advertisement expenses will exceed $10,000 for the project.[1]

Early in his career that brought him fame and fortune, Presley granted to Col. Tom Parker the exclusive right to market his name, picture, image, likeness and personality. These rights were in fact developed and marketed through various licensing arrangements. In 1974, Parker and Presley transferred all of these "commercial Elvis Presley rights" to Boxcar, Inc., a Tennessee corporation, which thereafter was the exclusive entity through which said rights were marketed.

On August 18, 1977, following his death, Boxcar granted, by written agreement, to defendant, the exclusive right to market the commercial Elvis Presley rights throughout the world upon payment to Boxcar of $100,000 against a guarantee of

---

1. The effort was made without specific prior approval of Memphis City officials or its Chamber of Commerce.

$150,000. Vernon Presley signed the agreement as executor of the Elvis Presley estate and as the representative of Presley's share of Boxcar. Defendant has begun marketing under this agreement, through licensing arrangements, Elvis Presley novelty items, among which are pewter statuettes of Elvis in three castings, expressly approved by Parker and Vernon Presley.

Plaintiff alleges that defendant has taken steps to interfere with plaintiff's attempts to solicit contributions in return for the statuettes it intended to distribute and seeks to restrain such interference. Both parties agree that the fleeting nature of the market for novelties following Elvis' death requires a swift determination of defendant's claim to the exclusive marketing rights of Presley's name and likeness.

Although there are assertions of antitrust violation and claims and cross-claims for damages involved, there is a central and crucial issue of law to be decided which will determine the rights of the parties in this litigation. Basically the plaintiff contends that the right to capitalize, to exploit and to publicize the name and reputation of Elvis Presley (and particularly by statue or replica) terminated at his death. Plaintiff therefore takes the position that it had a right after his death, free from interference, to use a commissioned statue of Presley to raise money for a public, non-profit purpose. Plaintiff contends it had to seek no approval or permission from anyone connected with Presley or his estate because the right to exploit the name and image or any publicity in connection with Elvis Presley was personal to him only and expired with him.

Defendant, on the other hand, takes the opposite position that the right of publicity and use of Elvis Presley's name and reputation and incidents thereof survives, particularly under the circumstances here which are not substantially in dispute. There is no question but that Elvis Presley enjoyed national and even worldwide fame as a singer, performer, actor and entertainer. He enjoyed the full benefits of the commercial use and exploitation of his name and fame during his lifetime, aided by and through an experienced business manager. Extensive efforts for his benefit were made during his lifetime under an exclusive right given by him to use and exploit commercially the Presley attributes which were well-known and valuable. The rights were restricted during his lifetime to authorized persons subject to royalties. The question now is: can an exclusive assignment to this same effect be valid and enforceable after Presley's death? If it can be, then defendant will prevail as a matter of law.

The parties have briefed and argued their respective positions thoroughly and have been of assistance to the Court in an area embodying a relative paucity of reported decisions.[2]

### PLAINTIFF'S CONTENTIONS:

A. The right to exploit the name and likeness is a branch of the common law right of privacy.

Prosser in his *Handbook of the Law of Torts* (3d ed. 1964) discusses four distinct kinds of invasion of four separate rights "encompassed with the law of privacy." The last one discussed by Dean Prosser is appropriating for another's benefit the name or likeness of a person. This is also the separate subject of reference in *Restatement of Torts* (2d), § 652C (Tentative draft 1967). Plaintiff, however, acknowledges that this fourth area, distinct from other invasions of privacy, is also termed a "right of publicity." See *Zacchini v. Scripps-Howard*, 47 Ohio St.2d 224, 351 N.E.2d 454 (1976), *rev'd. on other grounds*, —— U.S. ——, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) and *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953). The former sets out that "the 'privacy' which the performer seeks is personal control over commercial display and exploitation of his personality." 351 N.E.2d at 459. Plaintiff concedes that this has also been characterized a "property right," citing *Cepeda v. Swift & Co.*, 415 F.2d 1205

---

2. There is no reported case in Tennessee dealing with this question.

(8th Cir. 1969) and *Uhlaender v. Henricksen,* 316 F.Supp. 1277 (D.Minn. 1970), but plaintiff contends its proper description is that of a "proprietary right." See *Motschenbacher v. R. J. Reynolds Tobacco Co.,* 498 F.2d 821 (9th Cir. 1974). This case, however, also notes that other courts have recognized and protected a so-called "right of publicity" under the "rubric of 'property'." 498 F.2d at 825. But, maintains plaintiff, such right of Elvis Presley, however it may be characterized by these (or other) cases, to the commercial use of his name and likeness is not an inheritable right.

B. The right of publicity is not a "property right" and is not inheritable.

Several cases are relied upon by plaintiff that deal with the tax treatment of the right of publicity. *Miller v. Commissioner, Internal Revenue,* 299 F.2d 706 (2d Cir. 1962) involved a proceeding by Glenn Miller's widow contesting the treatment of income received by her many years after his death under an exclusive contract with a motion picture producer to produce "The Glenn Miller Story". The "specific question dividing the parties related to the meaning of the term 'capital asset'" in that case. 299 F.2d at 708. The court found that Mrs. Miller did not establish the payment to her to be for a capital asset[3], that it was not such "property" under the Internal Revenue Code as would qualify for capital gains treatment, because "not everything that can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." 299 F. 2d at 710–11. Plaintiff apparently relies upon the discussion in that case questioning whether "such a property right, if it existed, could pass to the sole beneficiary under his will" (299 F.2d at 709) and the conclusion that no such "capital asset property" came into existence after Miller's death. The second case, *Damon Runyon, Jr. v. United States,* 281 F.2d 590 (5th Cir. 1960)

reached a similar result on a New York contract made after Damon Runyon's death for a motion picture of his life and for the portrayal of the taxpayer himself therein. The court noted in the latter case a failure of the taxpayer to prove any legal right in himself to his father's life story; the taxpayer was not entitled to capital gains treatment on the payment received because New York statutory law on the "right of privacy" applied "only to a living person." 281 F.2d at 592. The court added, however, that "even though the taxpayer had a property right in the name and story of his father's life, there was nevertheless no sale of it."

Other cases relied upon by plaintiff, *Maritote v. Desilu Productions,* 345 F.2d 418 (7th Cir. 1965); *James v. Screen Gems, Inc.,* 174 Cal.App.2d 650, 344 P.2d 799 (1959); and *Schumann v. Lowe's, Inc.,* 135 N.Y.S.2d 361 (Supp. 1954) involved actions brought many years after the death of notorious or famous persons by a personal representative or kin asserting invasion of privacy on one hand causing mental suffering, and in others, misappropriation of a name. These cases held that such a right of privacy, as asserted, in the name or reputation of Al Capone or Jesse James was personal to them, and in the *Schumann* case that there was not demonstrated a right of inheritance or assignment shown.[4] These latter cases do not really address the issue here in controversy; the relatives were contending about a filmed presentation of the life or activities of a person long deceased. There was no claim that a recent effort or action was asserted after death to pursue any right of publicity for commercial ends which was initiated, recognized and utilized during lifetime of the personages involved by any plaintiff. "Comment, fictionalization, and even distortion of a dead man's career do not invade the privacy of his offspring, relatives, or friends." *Maritote, supra,* 345 F.2d at 420. The basic complaint

---

3. Elsewhere in the *Miller* decision, the Court acknowledged that the definition of the term, "capital asset", must be "narrowly applied." 299 F.2d at 711.

4. Robert Schumann died in 1856; Capone in 1947; and the plaintiffs' claim in the Capone (Maritote) case involved a claimed invasion of a right of privacy some 12 years after death.

in these cases (except *Schumann*) was humiliation from false and distorted stories about the deceased. That is an entirely different area of the law of privacy and would likely under the authorities go to the grave with the deceased.

Plaintiff here also relies on *Lugosi v. Universal Pictures,* 139 Cal.Rptr. 35 (Cal. App.1977), a case now on appeal to the Supreme Court of California. That case recognizes a Prosser-described "right of value" upon which a living person such as Bela Lugosi, an actor, can capitalize on his name and reputation by issuing licenses.

> "The tie-up of one's name, face and/or likeness with a business, product or service creates a tangible and saleable product in much the same way as property may be created by one who organizes under his name a business to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention."[5] 139 Cal.Rptr. at 37.

The Court further assumes that Lugosi might have so capitalized upon his famous role as Dracula during his lifetime, but

> ". . . whether Lugosi's heirs would have succeeded to such property depends entirely on how it was managed before Lugosi died. Lugosi may have sold the property and spent the consideration before he died, or sold it for installment payments and/or royalties due after his death, in which latter event such payments and/or royalties would, of course, be a part of his estate." 139 Cal.Rptr. at 38.

The California court concluded there was no right in a widow and son, 10 years after his death, to challenge the right of Universal, purportedly under a 36 year old agreement for production of "Dracula," to continue to exploit those film rights which had been assigned by Lugosi during his lifetime. This authority is extremely limited, in any event, because the case is now on appeal.

*DEFENDANT'S CONTENTIONS:*

A very recent New York case, *Factors, Inc. v. Creative Card Co.,* No. 77 Civ. 4400 CHT (filed 10/12/77), involving this same defendant and another party, decided and filed October 12, 1977, by Judge Charles Tenney, synthesizes defendant's position on the law involved. Defendant here, as plaintiff in that case, sought, successfully, to enjoin the distribution and sale of posters and commercially exploitive souvenir merchandise bearing the likeness of Elvis Presley. That court noted:

> ". . . it seems clear enough, at least for purposes of a preliminary injunction, that Presley gave Parker leave to exploit his image through merchandise and that Boxcar was, in recent years, the vehicle through which such merchandising was carried on."

The court further observed that for twenty years Presley, during his lifetime, dealt with the same people in the commercial utilization and licensing of his name and likeness. That court concluded, after citing three law review articles,[6] that Boxcar had a valuable right to transfer to Factors, a "right of publicity," a concept distinct from but related to traditional notions of the right to privacy because the latter commonly is designated in some fashion as a "right to be let alone," referring again to Professor Prosser in his work on *Torts.* The court stated that:

> "It is evident that courts address intrusions on feelings, reputation and privacy only when an individual has elected not to engage in personal commercialization. By contrast, when a 'persona' is in effect a product, and that product has already been marketed to good advantage, the appropriation by another of that valuable property has more to do with unfair competition than it does with the right to be

---

**5.** Citing *Johnston v. 20th Century Fox Film,* 82 Cal.App.2d 796, 810, 187 P.2d 474. Compare *Guglielmi v. Spelling-Goldberg Prods.,* 140 Cal. Rptr. 775 (Cal.Ct.App.2d, App.Dist.1977).

**6.** *Right of Property in Name, Likeness, Personality and History,* 55 Nw.U.L.Rev. 553 (1960); Nimmer, *The Right of Publicity,* 19 Law & Cont.Prob. 203 (1954); Note, *The Right of Publicity—Protection for Public Figures and Celebrities,* 42 Brook.L.Rev. 527 (1976).

left alone. *See Ettore v. Philco Television Broadcasting Corp.,* 229 F.2d 481, 490 (3d Cir. 1956); *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1282 (D.Minn.1970)."

In addition to these authorities, Judge Tenney also cites the United States Supreme Court in *Zacchini v. Scripps-Howard Broadcasting, supra,* —— U.S. at ——, 97 S.Ct. at 2856, 2857, 53 L.Ed.2d at 974–76, to this effect:

" . . . As we later note, the State's interest is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation. . . . An entertainer such as petitioner usually has no objection to the widespread publication of his act so long as he gets the commercial benefit of such publication.

. . . . .

" 'The rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get for free some aspect of the plaintiff that would have market value and for which he would normally pay.' Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?,* 31 Law and Contemporary Problems, 326–31 (1966)."

Other cases cited in *Factors, Inc. v. Creative Card, supra,* which recognize this right of publicity as a "species of property" are: *Cepeda v. Swift & Co., supra; Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836 (S.D.N.Y.1975); *Sharman v. C. Schmidt & Sons, Inc.,* 216 F.Supp. 401 (E.D.Pa.1963); *cf. Ettore v. Philco Television Broadcasting Corp., supra; O'Brien v. Pabst Sales Co.,* 124 F.2d 167 (5th Cir. 1941) *cert. den.,* 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1220 (1942); *id.* at 170–71 (Holmes, J., dissenting); *Grant v. Esquire, Inc.,* 367 F.Supp. 876 (S.D. N.Y.1973).

The Court then concluded:

" . . . There is no reason why the valuable right of publicity—*clearly exercised by and financially benefiting Elvis Presley in life*—should not descend at death like any other intangible property right." (emphasis added).

Another judge of the same court had decided the issue in the same fashion in *Price v. Hal Roach Studios, Inc., supra,* a case involving a dispute over commercial rights to the names and likenesses of Stan Laurel and Oliver Hardy after their decease. Again, Judge Stewart of that court recognized the separability of the right of publicity or "appropriation for commercial exploitation" and the classic right of privacy, though at the same time appreciating that the former emanates from the latter. See *Cary Grant v. Esquire, Inc., supra,* (Knapp, J.). The Court in *Price, supra,* holds that there was "such a property right" exercisable by Laurel and Hardy during their lifetimes, that this right did not terminate upon their death, particularly since they had used and promoted that right commercially during their lifetimes:

" . . . if it is not 'a matter of dispute that plaintiff has a valuable property right in his name, photograph and image and that he may sell these property rights,' *Cepeda v. Swift and Co., supra,* 415 F.2d at 1206, then what policy should operate to cut off his right at death?

"While authorities on the subject appear to be scarce, those considering the question have drawn a distinction between termination of a right to privacy at death and survival of a right of publicity." 400 F.Supp. at 844.

That court examined and distinguished carefully several of the cases cited by plaintiff here, including *Miller v. Universal Pictures,* 11 A.D.2d 47, 201 N.Y.S.2d 632 *aff'd* 10 N.Y.2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961) (no property interest in the Glenn Miller "sound") and *Lugosi v. Universal Pictures, supra.*[7]

---

**7.** "The present case is easier to decide than *Lugosi* since we deal here with actors portraying themselves and developing their own char-

acters rather than fictional characters which have been given a particular interpretation by an actor." 400 F.Supp. at 845.

*Price* also decided that federal laws do not preempt state action in the realm of state protection of a right of publicity, nor could it be inferred that states could not grant protection in the nature of copyright laws.[8] The court concluded, then, that the right of publicity did not terminate upon the death of Laurel and Hardy and that an unauthorized exploitation could be enjoined by their estates on the basis of an unjust enrichment and wrongful appropriation of a valuable right (despite a movie copyright claimed by defendant).

Defendant, and the two New York cases above discussed in some detail, rely on a number of cases to the effect that Presley himself possessed a valuable and exclusive right to market his name and likeness. Perhaps the leading case to that effect is *Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d 866 (2d Cir.), *cert. den.* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), which clearly recognizes and discusses the "right of publicity" as distinguished from the traditional ideas of the right of privacy.

". . . We think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, *i. e.*, the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made 'in gross,' *i. e.*, without an accompanying transfer of a business or of anything else. Whether it be labelled a 'property' right is immaterial; for here, as often elsewhere, the tag 'property' simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

. . . . .

". . . This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures." 202 F.2d at 866–68.

To the same effect in the case of Orlando Cepeda, this "valuable property right in his name and image" was recognized. *Cepeda v. Swift and Co., supra* at 1206. See also *Uhlaender v. Henricksen, supra,* and *Booth v. Curtis Pub. Co.,* 11 N.Y.2d 907, 228 N.Y. S.2d 468, 182 N.E.2d 812 (1962). *Ettore v. Philco Television,* 229 F.2d 481, 487 (3d Cir. 1956) also found "recognition of a kind of property right in the performer," which might be limited or marketed by the performer (in that case a boxer), and that unauthorized use was akin to unfair competition, citing *Fred Waring v. WDAS,* 327 Pa. 433, 194 A. 631 (1937). See also *Rosemont Enterprises v. Urban Systems, Inc.,* 72 Misc.2d 788, 340 N.Y.S.2d 144 (1973) and *Hogan v. Barnes,* 144 U.S.P.Q. 314 (1957).

### LAW TO BE APPLIED:

Tennessee courts have protected intangible property rights in instances involving unauthorized use of a trade name and unlawful interference with commercial good will.[9] The United States Supreme Court has recognized that a state's interest in protecting an intangible property such as the proprietary interest of an individual in his act or performance to prevent unjust enrichment is somewhat akin to patent and copyright protection. *Zacchini v. Scripps-Howard, supra.*

■ This Court must endeavor in the absence of any decision on this issue of the survival after death of a right of publicity to ascertain from all the available information the general or majority rule on the issue which would be considered to be adopted by the highest court of this state if the issue were before it. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Carr v. American Universal Ins. Co.,* 341 F.2d 220 (6th Cir. 1965); *Werthan Bag Corp. v. Agnew,* 202 F.2d 119 (6th Cir. 1953).

---

**8.** See *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1972).

**9.** *Sanford-Day Iron Works v. Interprise Foundry,* 138 Tenn. 437, 198 S.W. 258 (1917); *Bradford & Carson v. Montgomery Furn. Co.,* 115 Tenn. 610, 92 S.W. 1104 (1905).

■ The Court concludes after considering the positions by each of the parties and the authorities herein discussed that Elvis Presley himself had what has been recognized in Tennessee as a valuable proprietary right, a kind of property right in his name and image, and he had an exclusive right to market it, to assign it, or to benefit from its use commercially. It is doubtful that plaintiff seriously challenges this conclusion. Furthermore, Tennessee courts would protect and safeguard Presley in the proprietary right of publicity, whether or not it would be so designated, as in the case of unfair competition, unjust enrichment, or wrongful appropriation of good will.

■ The well-reasoned cases, it is believed, set out a clear distinction between the valuable right of publicity of public figures such as Presley and the right of privacy in the sense of being left alone, free from harassment or humiliation, a tortious claim. Tennessee courts would recognize and acknowledge this difference. Elvis Presley himself, through Parker and Boxcar, fully pursued this exclusive right of publicity during his lifetime. The party holding this exclusive right during lifetime and the personal representative of Elvis Presley, after his death, unequivocally attempted to assign to the defendant exclusive rights to the name and image as it relates to the kind of statuary involved in this proceeding.

■ Would that right of publicity be transferable or inheritable after death in the Tennessee courts? The recent authority, both judicial and scholarly, squarely on the point, under the circumstances applicable here, has acknowledged or logically determined that the right of publicity of the type involved in the Elvis Presley name and image should be inheritable and assignable.[10] A Tennessee court, by analogy, has recognized a special property right in the name "Robinson's" which was inherited by his widow, and further recognized her right to the exclusive use of the good will and the name even after the owner's death, to the exclusion of another, as to another's adoption of a name that would unfairly compete with that utilized commercially during his lifetime by James S. Robinson. *Robinson v. Robinson's, Inc.,* 9 Tenn.App. 103 (1929).

This Court holds that the correct and majority view, though there are few cases precisely in point, is that enunciated in *Factors, Inc. v. Creative Card Co., supra.* Defendant's position, then, as a matter of law, would prevail on this issue and plaintiff's motion for temporary injunction and/or for partial summary judgment must fail.

*RELIEF:*

Defendant is entitled to a decision on its petition for extraordinary relief if it can meet all the essential criteria. The first criteria, likelihood of success on the merits, has been discussed and concluded in defendant's favor by this Court's conclusion that defendant would prevail on the merits of the effectiveness of the assignment in question after death to the exclusion of plaintiff, which, although a "non-profit" entity, is, nevertheless, utilizing an Elvis Presley likeness in a commercial (and competitive) fashion without authority of the purported licensee or the estate itself. *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir. 1977); *Adams v. Federal Express Corp.,* 547 F.2d 319 (6th Cir. 1976); *Sonesta International Hotels v. Wellington Assoc.,* 483 F.2d 247, 250 (2d Cir. 1973). *Cf. SEC v. Senex Corp.,* 534 F.2d 1240 (6th Cir. 1976). Another criteria is irreparable injury demonstrated by the party seeking relief. It has been sufficiently demonstrated that to allow plaintiff (and others) to violate defendant's asserted rights as exclusive licensee would defeat and vitiate the contract between Boxcar and Factors, Inc. as approved by the Presley personal representative. The effect goes beyond Shelby County and merely a dispute between these parties as demonstrated in *Factors v. Creative Cards, supra.*

Balancing the equities or weighing the substantial harm to plaintiff persuades this

---

**10.** See "Defendant's Contentions", *supra* and authorities cited therein.

Court that defendant's petition for a temporary injunction should be granted. There is no showing of plaintiff corporation's worth or financial responsibility under the present uncertain circumstances in the event defendant were limited to seeking ultimately damages only. Finally, it is believed to be in the interests of equity to issue a preliminary injunction in favor of the defendant.

Defendant's motion for preliminary injunction will accordingly be granted.