**Madelon W. MEYER, Executrix of the Estate of William A. Meyer, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2809.**

United States District Court
E. D. Tennessee, N. D.

March 23, 1959.

Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for plaintiff.

John C. Crawford, Jr., U. S. Atty., Knoxville, Tenn., for defendant.

TAYLOR, District Judge.

On October 3, 1955 William A. Meyer and Madelon W. Meyer brought this action against the United States for refund of income taxes paid by them in 1951 in the amount of $1,550.66. Jurisdiction is based upon 28 U.S.C.A. § 1346 (a) (1).

Plaintiff William A. Meyer died on December 30, 1957; and upon application an order was entered by the Court substituting Madelon Warters Meyer, Executrix of the estate, as party-plaintiff herein. The action was tried without a jury.

The income taxes for which refund is claimed were paid by the plaintiff upon the sum of $2,500 received by plaintiff from Metro-Goldwyn-Mayer Studios in 1951 in connection with the production of a full-length motion picture entitled, "Angels In The Outfield." Plaintiff claims that the $2,500 was paid in settlement of injuries to his personal reputation and for invasion of his rights of privacy and represented non-taxable liquidated damages for these injuries. The Government, on the other hand, claims that the $2,500 was received by plaintiff for services rendered MGM and represented income to him.

The facts are these. In 1951 plaintiff, William A. Meyer, was manager of the Pittsburgh Pirates Baseball Club in the National League. In the same year MGM proposed to film a pictorial story about the Pittsburgh Pirates Baseball team. Members of the active playing squad appeared in the action sequence. However, the part of the manager was portrayed by the actor Paul Douglas. Meyer did not appear in the picture personally, nor was his name used. In the picture it was proposed that the name of the manager of the team be "Aloysius 'Guffy' McGovern." It does not appear from the record whether that name was actually used.

Clarence Brown of Los Angeles, California, who was producer-director of the picture testified by deposition with respect to the general story of "Angels In The Outfield,"

"It is the regeneration of a manager who was everything that he should not be as a manager. He curses, he swears, he fights back with the players, he fights back with the fans at the games, and-so-forth. In other words he is a very unsavory character—and furthermore the Pittsburgh Ball Club is at the bottom of the league. One evening after another loss, he is sitting dejectedly alone on second base and sore at the whole world when he hears a voice from out of the blue in the vernacular of a deceased ball player who has gone on before and is now up there playing a heavenly nine—telling him that before he can have a decent team he must change his ways

and reform. But he doesn't pay attention to it until he reads an article in the paper whereby a little girl from the orphanage who was at the ball game that afternoon had seen an angel over each of the players, then he realizes there might be something to this voice and he calls on the little girl and she verifies her story and convinces him there is something to this story. The voice comes back to him on several occasions and tells him what to do. Crazy things happen on the ball field; they do miraculous catches, hit home runs and the seemingly impossible. In the meantime the manager, Douglas, sees the light from all the weird happenings and in the end he reforms and winds up winning the pennant."

With reference to whether the picture pointed to plaintiff Meyer, Mr. Brown testified:

"Yes, it pointed directly to Mr. Meyer, the then manager of the Pittsburgh baseball team which had finished the year before at the bottom of the league, and it was even more pointed that it could be Mr. Meyer, because he was still Manager after the picture was released for public showing."

He testified that Mr Meyer read the script and was a little bit "squeasy" about it. He quoted Meyer, " 'They are making an awful heel out of me,' " and then commented, "Enough to make me suspicious that sometime in the future when the picture was released, and the million-and-a-half or whatever it was was in it, he would come through with a case."

Brown further testified:

"* * * In talking to Mr. Meyer I found out that he was a little bit sensitive about his part. The studio bends over backwards to keep from having any invasion of rights-of-privacy, or that sort of thing, brought against them after the picture is finished, so they like to settle those things before the picture

starts. So I had a talk with Meyer at this time and told him the circumstances and I got him to sign this letter that he signed, and I said 'I'm sure I can fix it with the studio so that you will be paid for this' * * * and this is all a little bit hazy, I can't remember exactly the continuity of events; however, I told the studio that 'I think to protect yourself that you should give him some kind of remuneration,' and the studio and myself decided on twenty-five hundred dollars ($2500.-00). So that is the way the whole deal came out. I got the check from the studio and presented it to Mr. Meyer, and this paper was signed. That is about the gist of the thing."

The Government concedes that if Meyer performed any technical services in connection with the filming of the picture they were slight. Mr. Brown testified that Meyer was not employed at all by the Company, was not paid for reading or approving the script and performed no service in connection with the film except perhaps to answer a question whether there was a "good catch on third base" —or something like that. He testified "that the twenty-five hundred dollars was paid for the rights of invasion of privacy and for nothing else. * * * This is a very common practice in the picture business."

A photostat of the $2,500 check, dated March 24, 1951, by which Meyer was paid, is in evidence, but there are no notations thereon which point to the reasons for its delivery. The Government urges that a letter dated March 13, 1951 from Mr. Dore Schary, Vice President in charge of production of MGM, to Meyer (a copy of which was "approved" by Meyer) contains a sentence in the nature of a release of "all claims" or rights against MGM which Meyer might have, because of the expected publication of the motion picture. The sentence relied upon is the second 'in the last paragraph of the letter. The last paragraph is copied:

"Please be so kind and return the attached copy of this letter signed

by you so that we may have for our records your written consent, and in reliance thereon proceed with our plans. *Such consent is meant to cover the making of our motion picture, its air and screen trailers and its advertizing and publicity, and such may be projected and transmitted by any means or method by us, our assigns and licensees.*" (Emphasis by the Court.)

■ The Court finds as a fact that the money paid to Meyer represented an attempt to pay him liquidated damages for possible future injuries to his reputation resulting from invasions of his privacy. It finds no substantial evidence that the money represented payment to him for the story of his life, for technical services, or for other consideration.

On their joint return for the taxable year 1951 taxpayer reported the sum of $2,500 as salary or wages received from Loew's, Inc., (The parent organization). This claim for refund was timely filed on March 11, 1955.

In their brief the taxpayers cite Solicitors Opinion 132, Cumulative Bulletin 1922, page 22, which reads in part as follows:

"Money received, whether under agreement of the parties or pursuant to judgment of a court on account of damages for alienation of affections, or defamation of personal character * * * does not constitute income within the meaning of the Sixteenth Amendment and the statutes enacted thereunder."

In support of his claim the plaintiff cited also the opinion of the Board of Tax Appeals in C. A. Hawkins v. Commissioner of Internal Revenue, 6 B.T.A. 1023, in which it reversed the Commissioner. In that case petitioner, an engineer, was removed from office as president of the C. L. Best Gas Traction Company and certain of the officers of the company filed defamatory statements about him. He sued the company and the officers for libel and slander and the case was settled for $100,000 in cash, a note for $12,500

and interest of $306.41. A deficiency of $19,718.39 income tax was levied against him, a part of which included the amount received in settlement of the claim for libel and slander. The Board said at pages 1024 and 1025:

"* * * So far as the evidence shows, the amount which petitioner received was wholly by way of general damages for the personal injury suffered by reason of the defamatory statements made. It was compensation for injury to his personal reputation for integrity and fair dealing, including, as the record indicates, the injury to his health. This is the ordinary basis for compensatory damages, Childers v. San Jose Mercury Printing & Publishing Co., 105 Cal. 284, 38 P. 903. No suggestion is made that there was special damage paid or that any was asserted or that punitive or exemplary damages were claimed or paid, and we need not consider the law as to them. Here there is only the compensation which the law sanctions as the only remedy which has thus far been devised for an injury which in its nature is wholly personal and nonpecuniary. Even to the economist, character or reputation or other strictly personal attributes are not capital or otherwise measurable in terms of wealth, notwithstanding that all will recognize them as important factors of economic success. They are not property or goods. Such compensation as general damages adds nothing to the individual, for the very concept which sanctions it prohibits that it shall include a profit. It is an attempt to make the plaintiff whole as before the injury."

It concluded the $306.41 interest was within statutory gross income, but held the $12,500 was properly omitted by the petitioner.

There is little doubt in the Court's mind that if Meyer had actually sustained damage through invasion of his right of privacy, moneys received in compensation for the injury would not be in-

come. If he had not been damaged, then the payment would not have been made to make him whole for damage done but would in fact add something to his worth. The difficulty the Court has is, that the record is devoid of proof that damage had been sustained either at the time Meyer's approval was given and the payment made, or at any later time. The letter from Mr. Schary was dated March 13, 1951. Presumably Meyer approved it almost immediately, since the check was issued on March 24, 1951. The picture was not released until late August. At the time the check was given, no damage had been sustained, since production had not even begun. Mr. Brown testified MGM would not under its practice have made the picture until the release was signed. The only evidence in the record on the question of damage is found in an opinion of Mr. Brown expressed in the following colloquy:

"Q. Do you know whether the publication of this picture in any way affected Mr. Meyer's business activities or his relationship with baseball?

"A. I couldn't tell you that. I don't think so.

"Q. You don't?

"A. No, because the picture turned out to be a very popular picture with the baseball fans."

The plaintiff has not shown injury or damage. At best the payment represented liquidated damage for possible injury to his reputation and invasion of privacy in the future.

Only one case has been cited to the Court in which the tax status of a present payment for possible future injuries has been considered. This is the case of Ehrlich v. Higgins, D.C.S.D.N.Y., 52 F. Supp. 805, 807.

In that case the plaintiff was the widow of an eminent German physician. The Warner Bros. Pictures, Inc., became interested in the portrayal of his life in a motion picture to be known as "Dr. Ehrlich's Magic Bullet." The family, including the plaintiff and her two daughters,

made available many documents and notes and granted exclusive motion picture, radio and television rights. The contract gave exclusive right to the use of the name, likeness or representation of the signer for purposes of advertising, and provided that the person executing would not institute any action against Warner connected with "the exercise of any of the rights granted to Warner, and/or on the ground that Warner has published anything libelous, slanderous or defamatory of or concerning the undersigned, or has used her name, photograph, portrait, picture, or physical likeness, representation, or impersonation in any improper or unauthorized manner." The consideration was $42,500 and Warner withheld $4,250 thereof, paying it to the Collector of Internal Revenue. Plaintiff filed for a refund contending, among other things, that what Warner actually paid was damages for the violation of the right of privacy, and that it was hence not income.

The Court found as a fact that nothing "libelous, slanderous or defamatory" was actually published, and no wrong had been done. In a dictum, the Court went on to say, however, that the payments were for nothing more than the contractual surrender of a legal right and constituted income, and that the revenue laws contained no loophole for damages in prospect, for the violation of the right of privacy.

■ Although this statement by the Court was not necessary to its decision, it nevertheless expresses what this Court conceives to be the law. Sec. 22(b) of the Revenue Act of 1939, 26 U.S.C.A. § 22(b), contains no clause exempting a payment of this type from taxation. Subsec. (5), which exempts, among other things, the amounts received as compensation for personal injuries or sickness plus the amount of damages received on account of such injuries or sickness, covers situations most nearly analogous to that which we have here. But it is clear that this exemption is allowed for damages which have already occurred, and there is no suggestion of an exemption

for amounts paid for possible future damages.

The Court concludes from the facts that this payment was not a gift.

Petitioner has the burden of proving that this payment was made for damages sustained, and that the payment comes clearly within one of the stated exemptions. She has failed to do either. The petition for a refund must be denied.