FRANKLIN D. ROOSEVELT, JR., AND SUZANNE P. ROOSEVELT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1580–62.  Filed October 22, 1964.

*Clendon H. Lee,* for the petitioners.
*Warren S. Shine,* for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in the income tax of the petitioners for their taxable calendar year 1958, in the amount of $38,736.61. The portion of said deficiency here in controversy is approximately $12,647.

The sole issue is whether the sum of $18,615.21 which petitioner, Franklin D. Roosevelt, Jr., received during the taxable year as his share of certain box office proceeds from a stage play entitled "Sunrise at Campobello" (which play was written and produced after a certain contract relating to the same had been executed by the author and by said petitioner acting on behalf of himself and certain members of his family), constitutes gross income to him under the provisions of section 61 of the 1954 Code; or whether said sum is excludable from his gross income under the provisions of section 104(a)(2) of said Code, on the grounds that it was "indemnity for invasion of right of privacy under New York law," and hence that it falls within the ambit of the last-mentioned statute which provides an exclusion for "the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness."

FINDINGS OF FACT

All the facts have been stipulated, except for certain facts relating to the public careers of the above-named petitioner and his father, as to which the Court has taken judicial notice in accordance with re-

quests and stipulation of the parties. All facts stipulated are so found; and the written stipulation of facts and all exhibits referred to therein and attached thereto are incorporated herein by reference. A summary of the facts so stipulated and found is as follows.

The petitioners, Franklin D. Roosevelt, Jr., and Suzanne P. Roosevelt, are husband and wife who were residents of the State of New York during the taxable calendar year 1958 here involved. They filed for said year a joint Federal income tax return on the cash basis, with the district director of internal revenue for the Upper Manhattan District in New York City. The issue presented concerns only the husband, Franklin D. Roosevelt, Jr., whom we will hereinafter refer to as the petitioner.

Petitioner was born on August 17, 1914. He is an attorney at law. In May 1949 he was elected a Member of the House of Representatives from the 20th New York Congressional District. He was reelected to the House of Representatives from the same district in November 1950 and November 1952. In 1954 he was the Democratic Party candidate for attorney general of the State of New York but was defeated in the election therefor in November 1954.

Petitioner's father, the late Franklin Delano Roosevelt, was Assistant Secretary of the Navy during World War I, was a candidate for Vice President of the United States in 1920, was subsequently Governor of the State of New York, and was President of the United States from 1933 to 1945. In August 1921, he contracted poliomyelitis, also known as infantile paralysis. He died on April 12, 1945. On the above-mentioned date of August 1921, petitioner was 7 years of age.

On or about March 5, 1957, Dore Schary who was an established author and producer of stage plays and motion pictures, prepared and submitted to members of the Roosevelt family, an eight-page typewritten outline of a play which he proposed to write under the title of "Sunrise at Campobello." The outline stated, in substance and pertinent part, that the proposed play would concern itself with events in those years of the life of the late Franklin Delano Roosevelt (hereinafter referred to as F.D.R.) from August 1921 (when he contracted infantile paralysis) to the spring of 1924 (preceding the nomination by him at Madison Square Garden of Alfred E. Smith as the Democratic Party candidate for President of the United States). The outline also stated that the play would deal primarily with events immediately preceding said illness of F.D.R., his struggle to regain his health, the tensions he and his family endured during those distressing days, the events surrounding his return to activity, and finally his appearance at said 1924 Democratic Convention and his dramatic nomination of Al Smith "which convinced the world and himself that he was a potential major figure in the realm of politics." The outline

further said that the characters who would "form the dramatis personae" would be F.D.R., his wife Eleanor, his mother Sara, his daughter Anna, his sons James, Elliott, John, and petitioner, his doctors, his secretary, his close friend Louis Howe, and other individuals and groups of more incidental character. And it also stated in part:

The intent of the play is to be a tribute to F.D.R. and to those who loved him and supported him. * * *

The material has been sketched, of course, in many biographies. I believe I have read most of these thoroughly. But what is needed to make it a warm, human document in play form is detail—detail that I can obtain from those close to the events. I have no intention to expose or deflate, ridicule or degrade any of those involved. Indeed, there is nothing in my heart or my pen except devotion to the man I worshipped from afar and to the members of his family, some of whom I am proud to know on a personal level.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

I want the play to ring true—ring clear—and for the future to remain an important testimonial to the Roosevelt family and tradition. Hopefully, the film that will follow will put on celluloid these same events as a permanent visual record of those days of ordeal.

And then after setting forth "a sketchy outline of the play," it concluded:

Summing up—I believe F.D.R.'s story is a tremendous one to tell, in play and on film. I offer my talents, my devotion and my time and some considerable sacrifice of income to the creation of this work. The Roosevelt family will contribute its confidence, some of its time and its knowledge.

Among us, something good can be built.

If the Roosevelt family cannot enter into this with full cooperation and faith in me—it is futile for me to attempt this task, which, to me, would be a true labor of love.

Thereafter following approval of said outline by members of the Roosevelt family, a written agreement was executed which provided in pertinent part as follows:

AGREEMENT made this 10th day of July, 1957 between DORE SCHARY (herein called "Schary") and FRANKLIN D. ROOSEVELT, JR. (herein called "Roosevelt"), acting on behalf of himself and his siblings, ANNA, JAMES, ELLIOTT AND JOHN ROOSEVELT (all of whom are herein collectively called the "Roosevelt Family"), at New York, N.Y.

### WITNESSETH:

WHEREAS, Schary has expressed a desire to write a play dealing generally with the life of the late President Franklin D. Roosevelt from the period during which he contracted poliomyelitis to the general period of the 1924 Democratic National Convention: and

WHEREAS, Schary has written an eight (8) page outline of such proposed play (annexed hereto and made a part hereof), which outline has been approved by the Roosevelt Family: and

WHEREAS, the Roosevelt Family and Schary are desirous of entering into certain arrangements with respect to said play:

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

1. Roosevelt represents and warrants that he is authorized by the Roosevelt Family to enter into this agreement with Schary.

2. The above mentioned members of the Roosevelt Family shall, subject to their availability, consult with Schary at reasonable times requested by him for the purposes of discussing with him personal anecdotes, events, situations, incidents, data, etc. which may be required by him or helpful to him in connection with the writing of the aforesaid play and the exploitation of all rights therein. With respect to such consultation services which may be rendered by the members of the Roosevelt Family above mentioned, payments shall be made to each one at the rate of Fifty ($50) Dollars per hour. The Roosevelt Family does further agree to make available to Schary, documents, writings, photographs and other memorabilia relating to the above-described period of the late Franklin D. Roosevelt's life which is intended to be the subject matter of the play and/or motion picture based thereon.

In the event that Schary consults with Mrs. Eleanor Roosevelt for the purposes described above, she shall be entitled to receive payment at the rate of One Hundred ($100) Dollars per hour.

The aforesaid consultation fees which may be payable to Mrs. Eleanor Roosevelt and the Roosevelt Family, in accordance with the foregoing provision, shall be payable only out of the actual aggregate sums which may be remitted as Schary's share and the Roosevelt Family's share of stage royalties and/or other proceeds which may be derived from the exploitation of the play and motion picture and other rights therein and payable to Schary and the Roosevelt Family in accordance with this agreement. Such consultation fees shall be payable out of the aforesaid aggregate proceeds to the extent that same are sufficient and Schary shall not otherwise be responsible for the payment thereof. It is understood and agreed that the information which may be secured by Schary through consultations with the members of the Roosevelt Family under this paragraph and the documents which may be made available hereunder shall be used by Schary only for the purpose of writing of the play, its presentation on the stage and the use and exploitation of all other rights therein, including but not limited to motion picture rights and the publicity and advertising in connection therewith.

3. It is contemplated that the play shall be produced on the first-class legitimate stage in New York City on or before February 1st, 1959. While Schary shall be under no obligation to cause such play to be produced, it is agreed that if such production shall not take place on or before said date, the rights of Schary under this agreement including but not limited to those contained in paragraphs 6 and 7 hereof, shall thereupon terminate. Such termination, however, shall in no way be construed to give to the Roosevelt Family any rights in the play written by Schary. * * * Schary, in the course of the writing of the play, shall have the right to obtain such assistance from third parties, at his own expense, as he may desire.

*    *    *    *    *    *    *

5. In consideration of the covenants of the Roosevelt Family herein set forth in paragraphs 6 and 7, the Roosevelt Family and Schary hereby agree that, with respect to the play and any rights therein, the Roosevelt Family shall be paid or caused to be paid by Schary sums to be determined as follows:

(a) With respect to the first-class production of the play in the United States, not less than five (5%) percent of the gross weekly box office receipts (less admission and similar taxes on ticket sales and theatre party commissions, if any) such percentage being at least equal to the percentage received by Schary, and in addition a percentage of the net profits (to be determined as

hereinafter set forth) which may be derived by the stage producer from the presentation and exploitation of the play, and in addition a sum equal to any other sums Schary may receive in any capacity, relating to the first-class production in the play (other than monies received for the purpose of financing the production of the play). Schary undertakes that unless under a disability from acting in such capacity, he will be a co-producer of said first-class stage production in the United States. The percentage of net profits to be used in said computation, as above-provided, shall be determined by Schary, but shall be no less than a percentage of net profits equivalent to the percentage of net profits which Schary may receive as his share therefrom as producer. * * *

(b) With respect to motion picture rights, radio rights, television rights, stock rights, amateur rights, foreign rights, publication rights and all other rights of any kind or nature in and to the play or any part thereof, equal to the sums which Schary may receive for himself as his share in any capacity (other than as an investor) from the sale, lease, license or other disposition of all of said rights in the play. * * *

\* \* \* \* \* \* \*

6. In consideration of the payments provided in paragraph 5 above to be made to the Roosevelt Family and the covenants and undertakings of Schary hereunder, the above-described members of the Roosevelt Family do hereby agree as follows:

The aforesaid individuals irrevocably covenant, in perpetuity, that they, or any of them, will assert no claim and maintain no action or suit and will not consent to the assertion or maintenance by others of any claim, action or suit for invasion of the rights of privacy of any of them, and/or predicated on libel, slander or defamation by reason of the exercise by Schary or his successors, licensees, grantees, or assignees, of his rights with respect to the play and rights therein, including but not limited to, the use of names, portraits, likenesses, pictures, biographies, voice recordings and various portrayals, impersonations, etc. in such play, motion picture based thereon, in connection with any other rights therein, in connection with the advertising and publicity of the said play, motion picture, television presentations thereof, and other rights therein, and said individuals do release, discharge and acquit Schary, his successors, assigns, licensees and transferees (and its or their officers, directors or employees) of and from any and all claims, actions, causes of action, suits and demands whatsoever that such individuals or any of them, or anyone claiming under them, may hereafter have arising out of claims of invasion of privacy, slander, libel or defamation by reason of the foregoing or otherwise. * * *

7. In further consideration of the payments provided in paragraph 5 above to be made to Roosevelt and the covenants and undertakings of Schary hereunder, the aforesaid individuals do hereby further agree that they and each of them have not and shall not enter into any covenants with any party or parties other than Schary to refrain from suing for violation of rights of privacy, or libel or slander, by reason of the use of such third party or parties of the names, portraits, likenesses, pictures, biographies, voice recordings, imitations, portrayals or impressions, etc. of the aforesaid individual members of the Roosevelt Family and/or the late Franklin D. Roosevelt, nor will they give permission or authorization, nor grant or license any rights to such third party or parties to use their names, portraits, likenesses, pictures, biographies, voice recordings, imitations, portrayals, impersonations, etc. or that of the late Franklin D. Roosevelt, in any dramatic work or dramatic story or in any work based on any part of the life of the late Franklin D. Roosevelt for presentation on stage and/or in motion pictures and/or television, except as provided in

this paragraph. (The covenants by the Roosevelt Family described in this paragraph 7 are referred to herein, for convenience, as "covenants with third parties", and the restrictions against the making of such covenants by the Roosevelt Family with third parties are referred to as "restrictions against covenants with third parties.")

\* \* \* \* \* \* \*

11. All remittances made or caused to be made by Schary hereunder shall be made to and in the name of Franklin D. Roosevelt, Jr., at 598 Madison Avenue, New York, N.Y., and his receipt shall be deemed a valid receipt binding on the other members of the Roosevelt Family. \* \* \*

\* \* \* \* \* \* \*

13. The Roosevelt Family shall indemnify Schary for any liability, damages or loss which may be sustained by him in connection with any claim or cause of action as to which facts are established which show a breach by the Roosevelt Family of any covenant by it herein contained. \* \* \*

\* \* \* \* \* \* \*

16. Nothing herein contained shall in any way constitute a partnership between, or joint venture by, the parties hereto or be construed to evidence the intention of the parties to constitute such. \* \* \*

17. It is understood and agreed that while the period of the life of the late Franklin D. Roosevelt, which is to be the subject of Schary's play herein, is from the period during which he contracted poliomyelitis to the general period of the 1924 Democratic National Convention, nonetheless Schary shall have the right, in the play and any motion picture and television versons [sic] thereof, to include occasional references in dialogue and/or by way of flashback, etc. to events in other periods of the life of the late Franklin D. Roosevelt, \* \* \*

18. This agreement is made pursuant to and shall be governed by the laws of the State of New York.

\* \* \* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

DORE SCHARY

FRANKLIN D. ROOSEVELT, JR., individually and on behalf of Anna Roosevelt Halsted, James Roosevelt, Elliott Roosevelt and John Roosevelt

Agreed to:
    (S) ANNA ROOSEVELT HALSTED
    (S) JAMES ROOSEVELT
    (S) ELLIOTT ROOSEVELT
    (S) JOHN ROOSEVELT

Following the execution of said agreement, Dore Schary wrote the stage play entitled "Sunrise at Campobello" (a printed copy of which is included in the evidence herein as Exhibit 2–B). The characters who depicted the Roosevelt children therein had only minor roles. Petitioner who was only 7 years of age at the time of the

opening scene, was portrayed in only three of the play's eight scenes; and the character who played his part had relatively few speaking lines, and portrayed actions appropriate to a child of said age.

Petitioner, beyond casual references to the period covered by the play during negotiations with Schary preliminary to said agreement, did not consult with or in any way assist or make suggestions to Schary or render any services in connection with the writing or production of the play; nor did petitioner furnish any documents, anecdotes, memorabilia, photographs, or other material or information to Dore Schary in connection with the writing or the production of said play.

On several occasions prior to the completion of the play Dore Schary consulted with the late Eleanor Roosevelt concerning events of the period to be covered by the play. After the play was completed, Schary read the play to the late Eleanor Roosevelt in the presence of James Roosevelt and petitioner. Petitioner's mother suggested a few minor factual changes, which were incorporated into the play. Petitioner did not offer any suggestion to Schary.

After tryouts of the play in Boston, New Haven, and Philadelphia, the same was presented in New York City by the Theatre Guild and Dore Schary on January 30, 1958, and was performed continuously during the remainder of 1958. It was also performed during parts of 1958 in Wilmington (Del.), Pittsburgh, and Cleveland.

During the year 1958 the Theatre Guild, on behalf of Dore Schary, paid to petitioner the sum of $98,092.24, which was 5 percent of the 1958 weekly box office receipts from performances of the play, pursuant to said agreement. Approximately $12,000 of said $98,092.24 represented 5 percent of the box office receipts from the performances given in Boston, Philadelphia, New Haven, Wilmington (Del.), Pittsburgh, and Cleveland; and the balance of said $98,092.24 was from performances given in New York City. Petitioner paid legal expenses of $5,016.17; paid four-fifths of the remaining balance of $93,076.07 in equal shares to his sister and three brothers; and personally received and retained the remaining one-fifth, or $18,615.21.

Petitioner and his wife attached to their joint Federal income tax return for the year 1958 here involved, the following statement:

STATEMENT BY TAXPAYER

The taxpayer, Franklin D. Roosevelt, Jr., received approximately $18,000.00 under a contract with Dore Schary to reimburse him for the invasion of his rights of privacy in connection with the production of the play entitled "Sunrise at Campobello", which, pursuant to Solicitor's Opinion 132 I-1, CB 92, is not regarded as taxable income.

In accordance with that statement, petitioner and his wife did not include in the gross income reported on their 1958 return, the said

sum of $18,615.21 which petitioner received and retained as aforesaid (which sum is the "approximately $18,000.00" referred to in the above statement).

The Commissioner-respondent, in his notice of deficiency herein, included said sum of $18,615.21 in the taxable income of petitioner and his wife; and he explained the adjustment as follows:

It has been determined that the amount of $18,615.21 received by you in the taxable year ended December 31, 1958 pursuant to the terms of an agreement between Franklin D. Roosevelt, Jr. and Dore Schary dated July 10, 1957, constitutes ordinary income, and as such is taxable as ordinary income under the provisions of Section 61 of the Internal Revenue Code of 1954.

It has not been established by you that the amount of $18,615.21, or any part thereof, is excludable under the provisions of Section 104(a)(2) or any other Section of the Internal Revenue Code.

### ULTIMATE FINDING OF FACT

The portrayal of petitioner and the use of his name in the play "Sunrise at Campobello" were not intended to, and did not, cause petitioner any loss of character, reputation, or personal dignity; nor did they cause any personal injury or damage whatsoever.

### OPINION

The petitioner's position herein is succinctly set forth in the statement of points in his principal brief, which we quote in its entirety:

New York law compels the conclusion that the moneys received and retained by petitioner after performances of a play "Sunrise at Campobello" constituted indemnity for actual general damage (Point I) for invasion of privacy under New York law (Point II).

The New York law to which he so refers is the pertinent portions of those New York statutes which are set forth in the margin.[1] We do not agree with said position.

1. The so-called right of privacy is a relatively new concept in the law of torts; it having made its appearance on the legal scene in the United States in 1890, in the landmark article by Warren and Brandeis

---

[1] N.Y. Civ. Rights Law, secs. 50 and 51, as amended.

Sec. 50.  Right of privacy.

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person *without having first obtained the written consent of such person,* or if a minor of his or her parent or guardian, is guilty of a misdemeanor.  [Emphasis supplied.]

Sec. 51.  *Action for injunction and for damages*

Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade *without the written consent first obtained as above provided* may maintain an equitable action in the supreme court of this state against the person, firm, or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture *in such manner as is forbidden or declared to be unlawful by the last section,* the jury, in its discretion, may award exemplary damages. * * * [Emphasis supplied.]

(later Mr. Justice Brandeis) entitled "The Right of Privacy," 4 Harv. L. Rev. 193. Several years thereafter, the Court of Appeals of New York held in the early case of *Roberson* v. *Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902), that no common law right of privacy existed in that State. Thereafter in the legislative session next following the decision in the *Roberson* case, sections 50 and 51 of the New York Civil Rights Law (fn. 1, *supra*) were enacted.

Since the enactment of said sections, the New York courts have held that in that State the right of privacy is purely a statutory right, the limits of which are fixed by sections 50 and 51 and the cases construing the same. They have held that the main purpose of these sections is to prevent the use of an individual's name for commercial purpose without his consent (*Orsini* v. *Eastern Wine Corp.*, 190 Misc. 235, 73 N.Y.S. 2d 426) ; that they were designed to forbid only unauthorized and wanton appropriation or use of a person's name, where such use is wholly unrelated to matters or things with which such name is associated (*Kline* v. *Robert M. McBride & Co.*, 170 Misc. 974, 11 N.Y.S. 2d 674) ; and that the mere incidental use of a person's name in a novel or motion picture is not actionable under section 51 (*Damron* v. *Doubleday, Doran & Co.*, 231 N.Y. Supp. 444 (Sup. Ct. 1928), affd. 234 N.Y. Supp. 773 (1st Dept. 1929)). In the latter case, the trial court said in the course of dismissing the complaint (p. 446) :

The law was not passed with the idea of interfering with the circulation of newspapers or the publication of books within proper limits, and the use of "local color" was not outlawed.

Based on the foregoing decisions, we have serious doubts whether, even if petitioner had not given his consent to Schary and even if Schary had gone ahead with the writing and presentation of the play without such consent, there would have been any actionable invasion of petitioner's right of privacy. The play appears to us, from our examination of the script thereof which is in evidence, to deal truthfully and factually [2] with a period in the life of the late President Franklin D. Roosevelt; and to be a type of subject matter about which Schary could write without fear of incurring any liability for damages. The portrayal of petitioner as a member of the Roosevelt family, and the use of his name therein, were purely incidental to the development of the main theme of the play; and these appear to us no more than something in the nature of the "local color" mentioned in the *Damron* case. Certainly this did not effect any wanton appropriation of petitioner's name or personality. It also is to be remembered that petitioner himself was, at the time of the performance of the play, a public figure who

---

[2] It is to be noted that petitioner approved an outline of the play prior to Schary's actual writing thereof; and that Schary read the completed script to petitioner, his mother, and one of his brothers—at which time petitioner's mother suggested a few minor factual changes which were then embodied in the play by Schary.

had submitted his life to public scrutiny and had made it a matter of legitimate public interest. And, of course, his status as the son of the late President Roosevelt gave the public, to some degree at least, an interest in petitioner's childhood. See and compare *Sidis* v. *F-R Pub. Corp.*, 113 F. 2d 806 (C.A. 2), certiorari denied 311 U.S. 711.

What was actually done did not, in our view, constitute actionable injury to petitioner. This is so, because petitioner had given his written consent to the use of his name and childhood personality in the play; and also because sections 50 and 51 are specific on the point that only the use of a person's name *without such person's written consent* is wrongful, and lays the basis for equitable relief and an action for damages. No tort arises where such written consent is given; and we therefore find no basis for attributing any portion of the moneys received by petitioner from Schary to any intended indemnification for a nonexistent tort.

In the light of the foregoing, we think that the premise of petitioner's position—i.e., that he either anticipated or actually suffered general damages from an invasion of his right of privacy under the New York law—is without merit.

2. From our examination of the provisions of the July 10, 1957, agreement (portions of which have been set forth in our Findings of Fact), it appears clear to us that the payments of approximately $18,000 which petitioner received and which are here involved, represented consideration for four undertakings by him (jointly with his sister and brothers) : (1) To render consulting services to Schary; (2) to make available to Schary any requested documents, photographs, or other memorabilia; (3) to restrict his (petitioner's) right to deal with any persons other than Schary, concerning the production of dramatic works based on President Roosevelt's life in any medium; and (4) to release Schary from any liability for invasion of petitioner's right of privacy or similar tort-based suits. Insofar as the $18,615.21 received by petitioner represented consideration for the first three of those undertakings, there can be no question that such consideration was compensatory in nature, was well within the reach of section 61, and was thus includable in petitioner's gross income.

It is true that petitioner did not actually render any significant consulting services, or furnish any documents, photographs, or other memorabilia. But this is not to say that petitioner's *undertakings* in these regards were without value at the time of the agreement with Schary. In a case somewhat similar in this respect to the instant case, we said :

Paragraph 3 [of a contract between the taxpayer and a motion-picture company, dealing with rights to make a motion picture based on the life of the taxpayer's deceased husband, the late band leader Glenn Miller] includes an undertaking by petitioner to cooperate in making available information and materials relat-

ing to Glenn Miller. Although the evidence indicates that Universal made but little use of her services in this connection, this does not mean that such potential services were valueless at the time the contract was executed. [*Helen D. Miller*, 35 T.C. 631, 642, affd. 299 F. 2d 706 (C.A. 2), certiorari denied 370 U.S. 923.]

The only conceivable element of the payments that could, even under petitioner's hypothesis, be excludable from gross income would be that relating to his release of Schary from liability for possible invasion of his right of privacy. As stated above, the remainder of the consideration is compensatory in nature and includable in income. A significant defect in petitioner's case is that the record contains no evidence which would make possible any identification or allocation of any of the total consideration which petitioner received, to his said release of Schary from liability. Petitioner had the burden of proof to establish the basis for such allocation, if any; and he has not borne such burden.

3. Petitioner further contended on brief that the parties to the agreement of July 10, 1957, "recognized thereby" that *following* the presentation of the play, petitioner "would be entitled to money damage for actual general damage for invasion of privacy"; and that such parties "provided therein" that in the event that the play were written, produced, and presented to audiences, petitioner would *thereafter* become entitled to receive for himself, his brothers, and sister "as liquidated actual general damages for invasion of privacy an amount equal to five per cent (5%) of the gross weekly box office receipts." We think this contention also is without merit.

In the first place, we find no support for such statements in the provisions of said agreement. Nowhere therein is there any statement or suggestion that the parties to such agreement "recognized thereby" that following the presentation of the play, petitioner "would be entitled to money damage" for invasion of privacy; and also, nowhere therein is there any statement tending to indicate that the parties to such agreement "recognized thereby" that any portion of the future box-office receipts to be paid over, would constitute or represent "liquidated actual general damages for invasion of privacy."

Secondly, it is our opinion, based on the authorities hereafter cited, that any moneys paid to any taxpayer as compensation for an *advance waiver of possible future damages* for personal injuries, would constitute taxable income to him under section 61 of the 1954 Code; and would not be excludable from his gross income under section 104 (a) (2) of said Code.[3]

In this connection, there should be kept in mind the rationale under-

---

[3] SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) IN GENERAL.—* * * gross income does not include—

      *            *            *            *            *

(2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness;

lying the exclusion from gross income of damages recovered for personal injuries. This rationale was made clear by the Supreme Court in its opinion in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, 432, fn. 8, wherein the Court said:

The long history of departmental rulings holding personal injury recoveries nontaxable [is based] on the theory that they roughly correspond to a return of capital * * *. See 2 Cum. Bull. 71; I-1 Cum. Bull. 92, 93; VII-2 Cum. Bull. 123; 1954-1 Cum. Bull. 179, 180. Damages for personal injury are by definition compensatory only. * * *

Put another way by the Court of Appeals for the Ninth Circuit: "Damages paid for personal injuries are excluded from gross income because they make the taxpayer whole from a *previous* loss of personal rights—because, in effect, they *restore* a loss to capital. * * * This rationale will not support the exemption of receipts which do not compensate taxpayer for a loss but instead add to his wealth." (Emphasis supplied.) *Starrels* v. *Commissioner*, 304 F. 2d 574, 576, affirming 35 T.C. 646.

In the instant case, our examination of the script of Schary's play convinces us, and we have hereinabove found as an ultimate fact, that the portrayal of petitioner and the use of his name therein caused him no injury or damage to his character or reputation or personal dignity, which could be analogized to a loss of capital. Absent any such injury, it cannot be said that any of the total amount of approximately $18,000 received by petitioner which might under any assumption be attributable to his waiver of any claims he might thereafter have for his right of privacy, represented compensation for loss of "capital," or to "make him whole from a previous loss of personal rights." Rather, we are convinced that petitioner was enriched and enabled to realize a clear gain by virtue of the payments made to him.

Moreover, in the above-cited *Starrels* case, this Court held that moneys received for a release from liability for a right-of-privacy invasion, where there was no proof that an injury was thereafter sustained, would *not* be excludable from gross income. We there stated in part (35 T.C. 646, 648–649):

If the payments based on this agreement could be made tax exempt by merely referring to a right of privacy which was never invaded and possibly never intended to be invaded, the narrowly conceived statutory exclusion for damages on account of "personal injuries" (sec. 104(a)(2), I.R.C. 1954)[2] would be expanded beyond its normal meaning. We think that Congress intended no such result.

Whether money paid to obtain a release for a right-of-privacy invasion in advance of such invasion should be excluded from taxable income where there is proof that an invasion of privacy actually followed—is a question not raised by the facts in the present case. It may well be that the voluntary advance waiver of one's personal rights for compensation takes the case outside the

purview of section 104(a)(2). Thus, one may receive compensation for allowing medical experiments upon his body in circumstances that would constitute a tort if his prior consent had not been given.[4] We have considerable doubt whether it was the purpose of section 104(a)(2) to remove such compensation from the category of taxable income. * * * Suffice it to say for purposes of deciding this case, we think no valid claim for exclusion may be made in this area without some showing of an injury which has been sustained. * * *

The Ninth Circuit, in affirming our decision in said *Starrels* case, not only indicated its agreement with the above-quoted statement from our opinion, but it also stated (in addition to the above-quoted portion of its opinion):

in any event it seems reasonably sure that the exemption in Section 104(a)(2) was not intended to reach advance payments for consent where no actual invasion of personal rights subsequently occurred. The language of Section 104(a)(2) reads most naturally in terms of payment for injuries sustained prior to a suit or settlement agreement. The "exemption is allowed for damages which have already occurred, and there is no suggestion of an exemption for amounts paid for possible future damages." Meyer v. United States, 173 F. Supp. 920, 924–925 (E.D. Tenn. 1959). See also Ehrlich v. Higgins, 52 F. Supp. 805, 808–809 (S.D.N.Y. 1943).

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

By a parity of reasoning [to what the Supreme Court said in the *Glenshaw* case], the exemption in favor of damages for personal injuries codified in Section 104(a)(2) cannot support the exemption of payments made for injuries which have never occurred because such payments are not compensatory and hence cannot be considered a restoration of capital.

Likewise, the revelant portions of the Treasury regulations point to an exclusion only for sums received *after* the sustaining of a personal injury by a taxpayer. Sec. 1.104–1(c), Income Tax Regs. These regulations provide in here pertinent part:

(c) *Damages received on account of personal injuries or sickness.* * * * The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.

See also *Helen D. Miller*, 35 T.C. 631, 642, aff'd. 299 F. 2d 706 (C.A. 2), certiorari denied 370 U.S. 923; *Runyon* v. *United States*, 281 F. 2d 590 (C.A. 5) ; *Meyer* v. *United States*, 173 F. Supp. 920 (E.D. Tenn.) ; and *Ehrlich* v. *Higgins*, 52 F. Supp. 805 (S.D.N.Y.).

---

4 By way of amplifying the hypothetical case mentioned in the *Starrels* case, we point out that a landowner has a right to be secure from invasion of his property by trespassers. But if for a consideration, he permits another to come upon his land and occupy the same, that consideration—which the law calls rent—is clearly compensatory and expressly includable in income by sec. 61(a)(5). Indeed, the present petitioner—like the landowner in the hypothetical case just posed—has a legally protected right; but petitioner—like that landholder—can forego the exercise of such right for a consideration. This petitioner's consideration—like that received by the landholder—must, we believe, be included in income.

Based on all of the foregoing, we hold that the $18,615.21 paid to and received by petitioner from Schary in the taxable year 1958 here involved, is includable in its entirety in petitioner's income for that year.

*Decision will be entered for the respondent.*