## NICHELLE G. PEREZ, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9103–12.          Filed January 22, 2015.

P received large sums of money in exchange for undergoing procedures to donate her eggs to infertile couples. Under P's contracts, the sums she received were designated compensation for pain and suffering. P did not report these amounts on her 2009 tax return. R issued a notice of deficiency. *Held*: Compensation for pain and suffering resulting from the consensual performance of a service contract is not "damages" under I.R.C. sec. 104(a)(2) and must be included in gross income.

51

*Richard A. Carpenter*, *Jody N. Swan*, and *Kevan P. McLaughlin*, for petitioner. [1]

*Terri L. Onorato*, *Robert Cudlip*, *Gordon Lee Gidlund*, and *Heather K. McCluskey*, for respondent.

HOLMES, *Judge*: Nichelle Perez received $20,000 under contracts that she signed with a clinic before she underwent a prolonged series of painful injections and operations to retrieve her unfertilized eggs for transfer to infertile couples. The contracts said that she was being paid in compensation for her pain and suffering. The Code says that *damages* for pain and suffering are not taxable.

Was the $20,000 Perez received "damages"?

### FINDINGS OF FACT

Perez is a 29-year-old single woman from Orange County, California. She is a high-school graduate and worked as a full-time sales associate for Sprint. In her early 20s Perez learned about egg donation. Her Internet search soon led her to the website of the Donor Source International, LLC—an egg-donation agency in Orange County that matches egg donors with women and couples struggling to conceive on their own.

A. *The Donor Source*

The Donor Source is a for-profit California company that has been in business since 2003. It is one of approximately 30 donor agencies in California and in 2009 supervised roughly 250 egg-donation cycles for its customers. The Donor Source recruits donors by advertising on Craigslist, in magazines, and by word of mouth. While any woman can apply to donate, only nonsmokers between the ages of 21 and 30 who have no family history of cancer or personal history of infertility or mental disorders will pass the initial screening. For those who pass, the donation process begins with an online application; and, if selected, potential donors are invited for

---

[1] The Court thanks petitioner's counsel for their outstanding *pro bono* work on the unprecedented question that this case raised. It also thanks the *amici curiae* who filed briefs on this case: Professor Bridget Crawford of Pace University School of Law; Professor Lisa Milot of University of Georgia School of Law; and Professor *Timothy M. Todd* of Liberty University School of Law.

a consultation to go over the time commitment, needed medications, and risks of egg donation. They are also subjected to a series of psychological and physical evaluations, including blood tests, pap smears, breast exams, and pregnancy tests. Once approved, the potential donor creates an online profile that includes a picture, a description of her family history, and other personal details for prospective parents to view.

This is all called egg "donation", but the term is a misnomer—the participant in the egg-stimulation and retrieval is compensated. (There are a small number of true donors—women who undergo the rigors of the process for an infertile relative or friend without compensation. This opinion isn't about them.) The Donor Source fixes the fee for first-time egg donors based on where the donor lives. For Southern California women, first-time donors are promised $5,500—and the price goes up with each subsequent donation. The Donor Source is registered with the American Society for Reproductive Medicine, which caps the compensation for egg donors at $5,000 to $10,000.[2] The Donor Source also promises to reimburse its suppliers for their expenses in traveling to and from their medical appointments.

## B. *The Contracts*

But such promises of future payments all depend on prospective parents' picking a particular donor. Once they do, the donor signs two contracts—one with the Donor Source and one with the anonymous intended parents. These contracts let the Donor Source—with the approval of the intended parents—terminate the relationship with the donor up until the time the donor begins receiving egg-stimulation medication—a series of hormone injections formulated to maximize egg production.

Perez signed one contract with the Donor Source in February 2009. It promised her money:

---

[2] For a summary of antitrust litigation over the alleged price-fixing by egg-donation agencies, see Kimberly D. Krawiec, "*Kamakahi v. ASRM*: The Egg Donor Price Fixing Litigation" (S. Cal. Law Sch. Legal Studies Research Paper No. 14–3), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2396027, and *Kamakahi v. Am. Soc'y for Reprod. Med.*, No. 3:11–CV–1781 (N.D. Cal. filed April 12, 2011).

> Donor Fee: Donor and Intended Parents will agree upon a Donor Fee for Donor's time, effort, inconvenience, pain, and suffering in donating her eggs. This fee is for Donor's good faith and full compliance with the donor egg procedure, not in exchange for or purchase of eggs and the quantity or quality of eggs retrieved will not affect the Donor Fee.

This meant that if Perez kept her side of the deal, but produced unusable eggs or no eggs at all, she would still be paid the contract price. The contract plainly provides that it is not for the sale of body parts:

> The Parties acknowledge and agree that the funds provided to the Donor shall not in any way constitute payment to Donor for her eggs.

It also allocates foreseeable risk. It states that the donor assumes "all medical risks and agree[s] to hold The Donor Source harmless from any and all liability for any and all physical or medical harm to herself * * *." The Donor Source takes its deals seriously, and its representative credibly testified that the company could sue Perez for breach of contract if she did not strictly comply with all the requirements.

The contract between Perez and the intended parents is in all ways consistent with the contract with the Donor Source. It provides that Perez's payment is "in consideration for all of her pain, suffering, time, inconvenience, and efforts." The contract waives any and all parental or custodial rights Perez may have over the donated eggs. Once the eggs are removed, they immediately become the property of the intended parents and are fertilized almost immediately. It also states:

> This Agreement does not instruct any of the Parties on the issue of taxation of any payment made or received pursuant to this Agreement or to any agreement with The Donor Source.

After signing the contracts, the Donor Source told Perez to take birth-control pills for approximately a month to synch her menstrual cycle with that of the intended mother. Then, up until March 27, 2009—the egg-retrieval date—Perez underwent a series of intrusive physical examinations. She frequently had to travel to a fertility clinic, submit to pregnancy tests, endure invasive internal ultrasound examinations, and have a syringe stuck into her arm to draw four to five vials of blood.

The needlework followed Perez home. She had to self-administer hormonal injections using a one-inch needle.

Perez injected herself with 10 units of Lupron each morning from March 7 to March 11, and she had to take the shots right into her stomach, which often bruised and hurt her. With complete credibility Perez said that these procedures were "actually very painful * * * it was burning the entire time you were injecting it."

As the retrieval date approached, the injection schedule increased. Between March 16 and 25, she had to self-administer anywhere from one to three daily injections of Lupron, Follistim, and Menopur. She made around 22 injections into her stomach during this period. Every time she had to administer another dose of the hormones, she had to search for a part of her stomach not already covered in bruises.

Then on March 25 Perez administered to herself—under the observation of a professional at a fertility clinic—the final "trigger shot" of hCG.[3] This is an intramuscular injection in the lower hip that goes through a two-inch needle. The shots caused Perez significant physical pain deep in her muscles as well as extreme abdominal bloating.

On the retrieval date, Perez was required to undergo anesthesia for the procedure. Doctors informed her that anesthesia carries with it a risk of possible death, and so she had to sign another liability waiver just before she went under. Egg removal is a type of surgery, during which the doctor worked his way into an anesthetized Perez with an ultrasound needle, and then penetrated her ovaries to harvest any viable eggs. The unnatural amount of hormones she'd taken had done their job, and the doctors were able to retrieve between 15 and 20 eggs—rather than the body's normal production of just one—from her. After it was over, Perez felt cramped and bloated; she had mood swings, headaches, nausea, and fatigue.

But she'd kept the promises she made and got a check for $10,000.

Perez went back for a second round that year. On August 31 she again contracted with the Donor Source. She again signed a written agreement with the intended parents. Both

---

[3] Human chorionic gonadotropin, a.k.a. the "pregnancy hormone." It is a hormone that exists naturally in the body and is injected into a donor's body to stimulate her ovaries to release all the unnaturally large number of matured eggs that have developed during the stimulation phase of the process.

agreements again expressly stated that payment was in "consideration for all of her pain, suffering, time, inconvenience, and efforts" and were otherwise identical to the first set that she had signed as part of the March cycle—including the liability and waiver provisions. When it was all over, she again got a check for $10,000.

The Donor Source sent a Form 1099 to Perez for $20,000 for tax year 2009. After consulting other egg donors online, Perez concluded that the money was not taxable because it compensated her only for pain and suffering; therefore, she left it off her tax return. The Commissioner disagreed and sent her a notice of deficiency. Perez timely filed a petition, and we tried the case in California, where Perez still lives.

## OPINION

We acknowledge that this case has received some publicity in tax and nontax publications, which is why it is important to state clearly what it does not concern. It does not require us to decide whether human eggs are capital assets. It does not require us to figure out how to allocate basis in the human body, or the holding period for human-body parts, or the character of the gain from the sale of those parts. [4]

A. *Nature of the Compensation*

So what is this case about? Both parties agree that payments Perez received were not for the sale of her eggs. Perez argues that they were in exchange for the pain, suffering, and physical injuries she endured as part of the egg-retrieval process; the Commissioner, on the other hand, argues Perez was simply compensated for services rendered. The only two cases we have found that are anywhere near this issue are *Green v. Commissioner*, 74 T.C. 1229 (1980), and *United States v. Garber*, 607 F.2d 92 (5th Cir. 1979). Both involved the exchange of blood plasma for compensation. In *Green*, the taxpayer was paid by the pint, and we found her to be engaged in the sale of tangible property rather than the

---

[4] For a thorough discussion of the sale of human-body parts, see Bridget J. Crawford, "Our Bodies, Our (Tax) Selves," 31 Va. Tax Rev. 695 (2012), and Lisa Milot, "What Are We—Laborers, Factories or Spare Parts? The Tax Treatment of Transfers of Human Body Materials," 67 Wash. & Lee L. Rev. 1053 (2010).

performance of services. *Green*, 74 T.C. at 1234. In *Garber*, the Fifth Circuit suggested the taxpayer might be engaged in the sale of property because the extent of her compensation was directly related to the concentration of antibodies in the plasma she produced. *Garber*, 607 F.2d at 97. It also noted that Garber had to undergo uncomfortable—and possibly dangerous—artificial stimulation and plasmapharesis to produce her plasma. This, the court observed, weighed in favor of finding that she was engaged in the performance of services. *Id.* But because the appeal was from a criminal conviction, the court concluded that it didn't have to solve this puzzle, and could instead decide the case on the ground that a criminal prosecution for tax evasion was "an inappropriate vehicle for pioneering interpretations of tax law." *Id.* at 100.

Both of Perez's 2009 contracts with the Donor Source specify that her compensation is in exchange for her "good faith and compliance with the donor egg procedure." Unlike the taxpayers in *Green* and *Garber*, who were paid by the quantity and the quality of plasma produced, Perez's compensation depended on neither the quantity nor the quality of the eggs retrieved, but solely on how far into the egg-retrieval process she went. On this key point, the testimony of both parties to the contracts agrees with the contract language. We have to find that Perez was compensated for services rendered and not for the sale of property.

And, as we know, "gross income means all income from whatever source derived, including * * * compensation for services." Sec. 61(a)(1).[5] But this general rule of inclusion has many exceptions, and the one that Perez points us to is section 104(a)(2). Thus the only issue we address is whether a taxpayer who suffers physical pain or injury while performing a contract for personal services may exclude the amounts paid under that service contract as "damages * * * received * * * on account of personal physical injuries or physical sickness" even though the taxpayer knew that such injury or sickness might occur and consented to it in advance. Sec. 104(a)(2).

---

[5] Unless otherwise noted, all section references are to the Internal Revenue Code for the year at issue.

Before the regulations were amended, section 1.104–1(c) used to require payments excluded under section 104(a)(2) be "received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104–1(c), Income Tax Regs. (former regulations), *amended by* T.D. 9573, 77 Fed. Reg. 3106–01, 3107 (Jan. 23, 2012). There were thus two separate requirements for a taxpayer to exclude income under section 104(a)(2): (1) the underlying cause of action giving rise to the recovery had to be based on tort or tort-type rights; and (2) the taxpayer had to receive the payment on account of his or her personal injuries or sickness. *Commissioner v. Schleier*, 515 U.S. 323, 333–34 (1995); *Blackwood v. Commissioner*, T.C. Memo. 2012–190; *Hansen v. Commissioner*, T.C. Memo. 2009–87.[6]

But the Secretary has amended these regulations and abandoned the *Schleier* language requiring a "tort or tort-type right." *See Simpson v. Commissioner*, 141 T.C. 331, 345 (2013); *see also O'Connor v. Commissioner*, T.C. Memo. 2012–317. The regulation now states:

> Section 104(a)(2) excludes from gross income the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness. [Sec. 1.104–1(c)(1), Income Tax Regs.]

Despite the change in the language, the new requirements look a lot like the old ones: (1) damages received (2) on account of personal physical injuries or physical sickness.

B. *Damages Requirement*

The regulations define the term "damages" as "an amount received (other than workers' compensation) through prosecution of a legal suit or action, or through a settlement agreement entered into in lieu of prosecution." Sec. 1.104–1(c)(1), Income Tax Regs. Perez questions whether the Secretary's regulatory interpretation of "damages" is permissible—whether the word "damages" in the Code allows the Sec-

---

[6] After *Schleier*, Congress amended section 104 to limit the exclusion to "personal *physical* injuries or *physical* sickness." *See* Small Business Job Protection Act of 1996, Pub. L. No. 104–188, sec. 1605(a), 110 Stat. at 1838 (emphasis added).

retary to implicitly require a lawsuit or threat of one as a condition of excluding "damages" from taxable income. This is an argument that the regulation is invalid, which means we must pull into the *Chevron* station. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *Mayo Found. For Med. Educ. & Research v. United States*, 562 U.S. 44, 45 (2011) (tax law no different from other areas of administrative law).[7]

We first ask if Congress has spoken directly to the question at issue. *Chevron*, 467 U.S. at 842. If not, we consider instead whether the Commissioner's regulation is a "reasonable interpretation" of Congress' intent. *Id.* at 843–44. The Code doesn't define "damages", and so we can swiftly hop up onto *Chevron*'s step two.

On this step, we find a regulation invalid only if it is "'arbitrary or capricious in substance or manifestly contrary to the statute.'" *Mayo Found.*, 562 U.S. at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)). Perez argues that the definition of "damages" in the regulation is invalid because it requires prosecution (or threat of prosecution) of a legal suit as a prerequisite for a payment's exclusion from income. A walk through the regulation's history seems in order here.

From the beginning of tax time, awards or settlement proceeds for personal injuries have been excluded from taxation. *See, e.g.*, Revenue Act of 1918, ch. 18, sec. 213(b)(6), 40 Stat. at 1066 (1919). The first section 104 regulations, enacted in 1960, required damages to be linked to a tort or tort-type right. *See* T.D. 6500, 25 Fed. Reg. 11402, 11490 (Nov. 26, 1960). And this "tort or tort-type right" was the focus of the regulations for half a century but, as Perez correctly points out, it is no longer. Perez cites several cases in support of her argument that we should interpret "damages" in section 104(a)(2) broadly to mean compensation in money received for a loss regardless of any legal suit or action.

We start with her reliance on *Simpson*. *Simpson* arose from a settlement between a taxpayer and her former

---

[7] Although Perez raises this issue for the first time on brief, we do not find the Commissioner surprised or prejudiced by it. *See DiLeo v. Commissioner*, 96 T.C. 858, 891–92 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *Markwardt v. Commissioner*, 64 T.C. 989, 997 (1975).

employer of a suit brought under the California Fair Employment and Housing Act, Cal. Gov't Code sec. 12940 (West 2011). In *Simpson* we noted that we had previously said that "'[s]ettlement amounts which are paid to settle workers' compensation claims are not excludable from gross income under section 104(a)(2) * * * [because] claims for workers' compensation do not necessarily involve tort or tort type rights.'" *Simpson*, 141 T.C. at 346 (quoting *Forste v. Commissioner*, T.C. Memo. 2003–103). And we quoted *Forste* again to further explain that "'[a] worker's compensation claim is not itself a tort or tort type cause of action since its elements involve fixed awards and since it is based on no-fault principles.'" *Id.* But we held that the change in the language of section 104(a)(2) meant that now some or all of the payments received in workers'-compensation cases could be excluded from gross income provided the taxpayer could show the portion of the claim "predicated on the taxpayer's personal physical injuries or physical sickness." *Id.* at 346–47; *see also Domeny v. Commissioner*, T.C. Memo. 2010–9, n.6 (in a situation where the taxpayer negotiated a settlement, finding it was immaterial whether a taxpayer formally brought allegations against the payor). But Perez's case is different from these—we don't have a settlement here, we have a waiver. And the waiver wasn't *post hoc*.

In *Starrels v. Commissioner*, 35 T.C. 646 (1961), *aff'd*, 304 F.2d 574 (9th Cir. 1962), we held that amounts contracted in advance for a consent to an invasion of privacy were taxable income and weren't excluded by section 104(a)(2). The Ninth Circuit agreed with us, and held that the section "reads most naturally in terms of payment for injuries sustained *prior to* a suit or settlement agreement." *Id.* at 576 (emphasis added). The court went on to note that these types of payments for personal injuries are excluded from gross income "because they make the taxpayer whole from a previous loss of personal rights." *Id.*

Again in *Roosevelt v. Commissioner*, 43 T.C. 77 (1964), we held that amounts FDR Jr. received for his share of the proceeds from a play about the life of his father were not excluded by section 104(a)(2). We reasoned that "moneys paid to any taxpayer as compensation for an *advance* waiver of possible future damages for personal injuries, would constitute taxable income to him under section 61 of the 1954

Code; and would not be excludable from his gross income under section 104(a)(2) of said Code." *Id.* at 87 (emphasis added).

Perez very clearly has a legally recognized interest against bodily invasion. But we must hold that when she forgoes that interest—and consents to such intimate invasion for payment—any amount she receives must be included in her taxable income. Had the Donor Source or the clinic exceeded the scope of Perez's consent, Perez may have had a claim for damages. But the injury here, as painful as it was to Perez, was exactly within the scope of the medical procedures to which she contractually consented. Twice. Her physical pain was a byproduct of performing a service contract, and we find that the payments were made not to compensate her for some unwanted invasion against her bodily integrity but to compensate her for services rendered.

But what is one to make of the regulation's amendment to remove the "tort and tort-type right" requirement? One should always pause before holding that an amendment didn't change anything. But here the reason is clear—the amendment *did* change the law—it just didn't change the law for people like Perez. In 1992 the Supreme Court decided *United States v. Burke*, 504 U.S. 229 (1992). It held that title VII backpay settlement awards were not excludable from income under section 104(a)(2). *Id.* at 242. At the time the statute read "damages received * * * on account of personal injuries," and the taxpayer pounced on the argument that her settlement with the Tennessee Valley Authority for unlawfully discriminating against her because she was a woman fit that requirement. Not so, said the Supreme Court. The Court emphasized that since the 1960s the Commissioner has formally linked the section 104(a)(2) exclusion to "tort or tort-type rights." *Id.* at 234. It pronounced:

> "The essential element of an exclusion under section 104(a)(2) is that the income involved must derive from some sort of tort claim against the payor . . . . As a result, common law tort concepts are helpful in deciding whether a taxpayer is being compensated for a 'personal injury'" * * * [*Id.*, *quoting Threlkeld v. Commissioner*, 87 T.C. 1294, 1305 (1986).]

A few years later, in *Schleier*, the Supreme Court reinforced the tort or tort-type right standard when it held that payments received in an Age Discrimination in Employment Act

settlement were not excludable under section 104(a)(2). *Schleier*, 515 U.S. at 337. The remedial scheme there also did not comport with traditional tort-type remedies, because the Act did not provide for compensation keyed to actual harm suffered. *Id.* at 335–36.

Shortly after the restrictive decisions in *Burke* and *Schleier*, Congress amended the Code in the Small Business Job Protection Act of 1996, Pub. L. No. 104–188, 110 Stat. 1755, and the Secretary in 2009 rewrote his regulations. This amended Code section and regulation let taxpayers who recovered under no-fault statutes exclude the "damages" that they received, even if they did not receive them for a "tort-type" claim. As we said in *Simpson*, the effect of removing the tort requirement from the regulation was to reverse the result in *Burke* and allow the exclusion for damages awarded under no-fault statutes. *See Simpson*, 141 T.C. at 346.

In 2012 the Commissioner officially explained that the "tort-type rights test was intended to distinguish damages for personal injuries from, for example, damages for breach of contract." T.D. 9573, 77 Fed. Reg. at 3107. The change in the section 104 regulation reflected a profusion of remedies for persons who are physically injured and recover under no-fault statutes, so that they are treated like those who are physically injured and recover through more traditional actions in tort. But that regulation still addresses situations where a taxpayer settles a claim for physical injuries or physical sickness before—or at least in lieu of—seeing litigation through to its conclusion.

This small change just helped tax regulation keep up with a bit of a shift in American law toward administrative or statutory remedies and away from common-law tort for some kinds of personal injuries. It is not at all arbitrary, capricious, or manifestly contrary to the Code. But it also doesn't help Perez. We completely believe Perez's utterly sincere and credible testimony that the series of medical procedures that culminated in the retrieval of her eggs was painful and dangerous to her present and future health. But what matters is that she voluntarily signed a contract to be paid to endure them. This means that the money she received was not "damages".

We conclude by noting that the result we reach today by taking a close look at the language and history of section 104

is also a reasonable one. We see no limit on the mischief that ruling in Perez's favor might cause: A professional boxer could argue that some part of the payments he received for his latest fight is excludable because they are payments for his bruises, cuts, and nosebleeds. A hockey player could argue that a portion of his million-dollar salary is allocable to the chipped teeth he invariably suffers during his career. And the same would go for the brain injuries suffered by football players and the less-noticed bodily damage daily endured by working men and women on farms and ranches, in mines, or on fishing boats. We don't doubt that some portion of the compensation paid all these people reflects the risk that they will feel pain and suffering, but it's a risk of pain and suffering that they agree to before they begin their work. And that makes it taxable compensation and not excludable damages.

Because Perez's compensation was not "damages" under section 104(a)(2), we must rule against her on the main issue in the case.

*Decision will be entered for respondent.*